## Richmond

BOARD OF SUPERVISORS OF JAMES CITY COUNTY, ET AL. V. MALVIN S.
ROWE, ET AL.

June 13, 1975.

Record No. 740994.

Present, All the Justices.

*Howard W. Dobbins (William A. Young, Jr.; Richard M. Price; Wallerstein, Goode & Dobbins*, on brief), for appellants.

*Robert C. Fitzgerald (Fitzgerald & Smith*, on brief), for appellees.

Poff, J., delivered the opinion of the court.

Upon a motion for declaratory judgment filed by the landowners[1] against the Board and another,[2] the trial court declared Article 8A of Chapter 20, Zoning Ordinance of James City County, including Sections 12-13 through 12-13-8 incorporated therein (hereafter 8A), facially unconstitutional in its entirety. On appeal, the Board asks us to reverse the judgment and enter final judgment declaring 8A valid in its entirety, or, in the alternative, to reverse the judgment, sever those portions of 8A found unconstitutional, and "provide guidelines" for "constitutionally acceptable" alternatives.

Landowners are the owners of 24 of 51 parcels of land in a 58-acre tract fronting a distance of about 1.4 miles on the southern side of U.S. Route 60, which, at this point, is an undivided, five-lane highway. The 58-acre tract (hereafter "the subject property") is bounded on the west by the City of Williamsburg and on the east by property owned by the Anheuser-Busch Company. The property opposite the subject property fronting on the north side of Route 60 is traversed by the main line of the C. & O. Railroad. The property south of the subject property is undeveloped land owned by Colonial Williamsburg Foundation. The land north of Route 60 is zoned B-1 ("general" business). The Anheuser-Busch property is zoned M-1 and M-2 ("limited" and "general" industrial) and has been developed in part as an industrial, commercial, and residential complex, and in part as the Busch Gardens, a "tourist attraction".

On January 10, 1973, the Board, by a vote of 3 to 2, enacted 8A in its original form. Under 8A, drafted with the technical assistance of Anheuser-Busch personnel, the subject property was rezoned from its B-1 classification to a new classification termed "Business Tourist

---

[1] Malvin S. Rowe, Marjorie T. Rowe, Charisma Townhouses, Inc., W. Roland Walker, Jessie P. Bass, Thelma A. Bass, Robert E. Berry, Ruth W. Berry, Garland C. Roberts, Susie M. Roberts, George D. Thompson, Margaret J. Thompson, Donald W. Alphin, Kathleen Ordonia, C. E. Douglas, William J. Bull, Joseph C. Cauthorn, Fate Thompson, Hester Thompson, William Stone, William R. Smith, Purnell Parker, Ruth Parker, and Estate of William Booker.

[2] The Board of Supervisors of James City County and John W. Watkins, Zoning Administrator for James City County.

Entry District, B-2". In its final form, 8A requires landowners within the B-2 district to (1) limit use of their property to hotels, motels, service stations ("with minor repair and under cover"), gift shops, antique shops, and restaurants (other than "fast food" or "drive-in" establishments); (2) build only on lots no less than 150 feet wide (or 120 feet wide for lots existing on January 10, 1973); (3) "set back" all buildings at least 75 feet from the "back of highway curb" on Route 60, or from the "top of the outer slope of the drainage way . . . if no such curb exists"; (4) dedicate the outer 55 feet of this setback for a service road, including curbs, sidewalks, and land-scaped median strip; (5) construct that road "in accordance with the applicable standards of the Virginia Department of Highways" and maintain the median strip; (6) provide a 10-foot perimeter open space adjoining property lines on the sides and rear and a 10-foot perimeter open space adjacent to buildings; (7) landscape and maintain such perimeter areas in "good condition"; and (8) submit all preliminary site plans to the "Architectural Design Review Board", a five-man body appointed by the Board for two-year terms.

The landowners filed their motion praying for a declaration that these land use restrictions and obligations, as applied to their par-ticular parcels, are unconstitutional. In a decree overruling the Board's demurrer, the trial court found that the motion "constitutes a challenge to the validity of Article 8A . . . as a whole, and not as it affects any particular plaintiff" and ruled that "the evidence in the trial of this case shall be limited to the validity or invalidity of the ordinance as it affects all property owners in a B-2 zone". This ruling became and remains the law of the case.

By final decree entered June 12, 1974, the trial court found

"that Article 8A . . . in its entirety, including [amendments thereto] . . . deprives the Complainants and owners in said B-2 zone of prop-erty and the reasonable use thereof without due process of law or just compensation, discriminates against said property owners, and imposes unreasonable restrictions upon the use of the properties within said B-2 zone, contains vague and indefinite language, and includes purposes and provisions not authorized by law".

Upon that finding, the trial court declared that 8A violates "Amend-ments V and XIV of the Constitution of the United States of

America and Section 11 of Article I of the Constitution of Virginia" and is "illegal, void, and of no effect."

Some of the questions posited by the numerous assignments of error are interrelated. For the sake of convenience and clarity, we will consider them in topical categories.

## I. *EXHAUSTION OF REMEDIES AND JUSTICIABILITY*

■ On appeal, the Board relies on three of its grounds of demurrer, *viz.*, that the motion failed to allege a justiciable controversy; that the motion failed to allege an inadequate remedy at law[3]; and that the motion failed to allege an exhaustion of administrative remedies.

Under Code § 8-578 (Repl. Vol. 1957), an action for declaratory judgment shall not "be open to objection on the ground that a judgment or order merely declaratory of right is prayed for", and "[c]ontroversies involving the interpretation of . . . statutes, municipal ordinances and other governmental regulations, may be so determined", provided there is an "actual antagonistic assertion and denial of right." To invoke the jurisdiction of the court, "[t]he controversy must be one that is justiciable, that is, where specific adverse claims based upon present rather than future or speculative facts, are ripe for judicial adjustment." *City of Fairfax* v. *Shanklin*, 205 Va. 227, 229, 135 S.E.2d 773, 775 (1964).

The "legality of an ordinance is tested not only by what has been done under its provisions but what may be done thereunder." *City of Winchester* v. *Glover*, 199 Va. 70, 72, 97 S.E.2d 661, 663 (1957). When, as here, a property owner alleges that a zoning ordinance creates discriminatory, arbitrary, and capricious classifications bearing no substantial relation to the public health, safety, or welfare, or that a zoning ordinance imposes land use restrictions or affirmative land use obligations so unreasonable as to constitute a "taking" of property without compensation or due process of law, or that a zoning ordinance is otherwise unconstitutional, and that he has suffered damage to his property located in a district affected by such ordinance, he has stated a case of actual controversy within the meaning of Code § 8-578 and one that is "ripe for judicial adjustment."

---

[3] Since the motion originally sought injunctive relief, the proceeding was conducted on the equity side of the court.

"If the ordinance is unreasonable and unconstitutional in its entirety and the result of such unreasonableness is to confiscate plaintiff's property or to discriminate against it, then an action for a declaratory judgment lies." 2 A. Rathkopf, *The Law of Zoning and Planning* 35-5 (1972).

The Board argues, however, that even when the constitutionality of a legislative act is challenged, "a court of equity does not have jurisdiction unless the complainant lacks an adequate remedy at law" and "the courts will not take jurisdiction of a zoning matter, even though a constitutional issue is raised, until the administrative remedy has been fully exhausted."

A landowner aggrieved by a zoning classification has a right to apply to the zoning administrator for a variance, a right to appeal to the County Board of Zoning Appeals, and a right to obtain judicial review of that board's decision. Code §§ 15.1-495, -497 (Repl. Vol. 1973, Cum. Supp. 1974); Article 13, James City County Zoning Ordinance. *See also, Lake George Corporation* v. *Standing*, 211 Va. 733, 180 S.E.2d 522 (1971). However, when the relief sought constitutes a challenge to the constitutionality of a zoning ordinance in its entirety,[4] only a variance providing total exemption would vindicate the rights asserted. But, under Code § 15.1-495, "all variances shall be in harmony with the intended spirit and purpose of the ordinance" in order "that the character of the district will not be changed". A variance releasing landowners from all the restrictions and obligations complained of here would be contrary to the intended "spirit and purpose" of 8A, and therefore would be beyond the purport of Code §§ 15.1-495, -497.

Since there was no administrative remedy equal to the relief sought (and thus no adequate legal remedy by judicial review), we hold that the motion properly stated a justiciable cause of action and the trial court correctly overruled the demurrer.

---

[4] A claim that a zoning ordinance is invalid in its entirety is one which alleges that "the ordinance is unreasonable in itself without regard to any particular property . . ."; where the claim is that the ordinance is invalid as applied, the alleged invalidity stems from factors "peculiar to the property involved." 2 Rathkopf, *supra* at 35-7 to 35-10. A landowner challenging the validity of a zoning ordinance as applied to his property need not apply for a variance before bringing his declaratory judgment action if the challenged restrictions or obligations could not be remedied by variance. 3 R. Anderson, *American Law of Zoning* § 24.06 (670) (1968); 2 Rathkopf, *supra* at 35-6; 2 E. Yokley, *Zoning Law and Practice* § 18-11 (405) (1965, Cum. Supp. 1974).

\*  \*  \*

We consider next the three broad constitutional issues raised by the Board's assignments of error, *viz.*, whether the B-2 zoning of the subject property to the exclusion of other areas is a discriminatory classification in violation of the equal protection guarantee; whether the land use obligations imposed by 8A violate the due process guarantee; and whether the land use restrictions imposed by 8A violate the due process or equal protection guarantees.

## II. *DISTRICT CLASSIFICATION AND EQUAL PROTECTION*

■ "The governing body of any county . . . may, by ordinance, divide the territory under its jurisdiction or any substantial portion thereof into districts of such number, shape and area as it may deem best suited to carry out the purposes of this article . . .", Code § 15.1-486 (Repl. Vol. 1973), and ". . . the regulations in one district may differ from those in other districts." Code § 15.1-488 (Repl. Vol. 1973). Encompassing the specific purposes of zoning ordinances defined in Code § 15.1-489 (Repl. Vol. 1973) is "the general purpose of promoting the health, safety or general welfare of the public. . . ." By these and related statutes, the General Assembly has delegated to local governments the police power to establish and regulate zoning districts.

Boundary lines of zoning districts must be struck somewhere, and a line drawn by the most impartial arbiter is, to some unavoidable degree, arbitrary.

"It is seldom that there is an definite reason for holding that a lot on one side of a line should be devoted to one purpose and that just across it to another. The adaptability of certain territorial sections of cities to certain uses fade into each other. One end of a field may be, beyond peradventure, suited to industrial developments, the other to private homes. Intervening there must be a twilight zone. If the legislature cannot be relied upon to say where lines must run, who can be vested with that discretion? Demonstrative accuracy is an impossibility." *West Bros. Brick Co.* v. *City of Alexandria,* 169 Va. 271, 283-84, 192 S.E. 881, 886 (1937), *app. dism'd,* 302 U.S. 658 (1937), *reh. denied,* 302 U.S. 781 (1938).

The landowners contend that a B-2 classification for the subject property is discriminatory because the adjacent property of Anheuser-Busch is classified M-1 and M-2. Adjacency is always relevant to the question of discriminatory zoning classification, but adjacent properties may be zoned differently when there is a rational basis for the different classifications. 8 E. McQuillin, *Municipal Corporations* § 25.61 (152-53)(1965); 1 Rathkopf, *supra* at 7-2 to 7-4; 1 Yokley, *supra* at § 4-17 (164). *See also, Lewis* v. *District of Columbia,* 190 F.2d 25, 28 (D. C. Cir. 1951). Zoning classifications of adjoining areas enjoy the presumption of legislative validity and equal protection until the presumption is overcome by evidence.of discrimination. *Board of Supervisors* v. *Carper,* 200 Va. 653, 107 S.E.2d 390 (1959); *Fairfax County* v. *Parker,* 186 Va. 675, 44 S.E.2d 9 (1947). Here, as far as the landowners' evidence shows, the only indicium of similarity between the subject property and the Anheuser-Busch property is physical adjacency, and the presumption of validity of the different classifications must prevail.

■ Conceding that "[t]he fact that only one area of the County is included within the B-2 Zone would not of itself prove discrimination", the landowners argue that "[t]he fact that other areas of the County meet the same criteria or definition as a 'tourist entry zone' but have not been burdened with the confiscatory restriction, does."

Under 8A, the B-2 classification "is not intended for general application in all parts of the County but will be limited to those areas where high traffic volume tourist corridors exist." The record contains some evidence that the roads bearing the heaviest tourist entry into the Williamsburg area are those which approach from the north and west, and none of the property along those several roads has been zoned B-2. However, the traffic entering the area on one of those roads is only a portion of the traffic travelling both east and west along Route 60 between Williamsburg and Busch Gardens. How the latter traffic load compares with traffic between the Williamsburg area and other major tourist attractions, such as Jamestown and Yorktown, is not disclosed by the evidence. Nor is there any evidence to show that, in respects other than traffic impact, the subject property is similar to other property situated between two historical attractions.

Absent such evidence, and in light of testimony that the subject property is "a very special piece of property" and is "unlike any other property in the County", the landowners failed to show that

zoning of the subject property to a classification different from that assigned other areas of the county is discriminatory.

## III. *LAND USE OBLIGATIONS AND DUE PROCESS*

Aside from restrictions on use, 8A imposes certain affirmative obligations as conditions to the right to develop.

### A. *DEDICATION*

■ B-2 landowners are required to dedicate to the county a parcel of land 55 feet wide fronting upon the south side of Route 60. This parcel will accommodate a sidewalk adjacent to the curb 5 feet wide, a median strip 15 feet wide, a curb 2.5 feet wide, a service road 24 feet wide, another curb 2.5 feet wide, and another sidewalk 6 feet wide. Based upon property values prior to the enactment of 8A, the value of the property required to be dedicated was in excess of $850,000.

By express statutory authorization, a landowner in Virginia may be involuntarily divested of his fee under certain defined circumstances. His land may be sold to satisfy a tax lien of the sovereign. Code §§ 58-1117.1, *et seq.* (Repl. Vol. 1974). His land may be sold to satisfy the claim of a judgment lien creditor. Code §§ 8-655, *et seq.* (Repl. Vol. 1957). His land may be taken by the sovereign for public purposes by eminent domain. Code §§ 25-46.1, *et seq.* (Repl. Vol. 1973, Cum. Supp. 1974). In every case of involuntary taking thus authorized by statute, there is a *quid pro quo* for the loss of the fee.

In some jurisdictions, the courts have held that the zoning enabling statutes authorize local zoning bodies to require subdividers to dedicate portions of their property for public purposes (or pay an assessment in lieu of such dedication) as a condition precedent to development.[5]

---

[5] The rationale for that rule is that the legislative purpose and effect of such dedication requirements is not to burden the landowner's right to use his land, but rather to enable him to put it to a use which, because of the unreasonable burden it would thrust upon public facilities, would be otherwise impermissible. Courts applying this rule have required that the public facility for which dedication is required be reasonably related to or "specifically and uniquely attributable" to the needs expected to be generated by the proposed development. *See Exchange Nat'l Bank* v. *Lake Forest,* 40 Ill. 2d 281, 287, 239 N.E.2d 819, 821 (1968); *Pioneer Trust & S. Bank* v. *Village of Mount Prospect,* 22 Ill. 2d 375, 380, 176 N.E.2d 799, 802 (1961); *Noland* v. *St. Louis County,* 478 S.W.2d 363, 367 (Mo. 1972); *Brazer* v. *Borough of Mountainside,* 55 N.J. 456, 465-66, 262 A.2d 857, 862 (1970); *McKain* v. *Toledo City Plan*

*Associated Home Builders* v. *City of Walnut Creek,* 4 Cal. 3d 633, 484 P.2d 606 (1971); *Ayres* v. *City Council of Los Angeles,* 34 Cal. 2d 31, 207 P.2d 1 (1949); *Aunt Hack Ridge Estates, Inc.* v. *Planning Com'n,* 160 Conn. 109, 273 A.2d 880 (1970); *Billings Properties, Inc.* v. *Yellowstone County,* 144 Mont. 25, 394 P.2d 182 (1964); *Jenad, Inc.* v. *Village of Scarsdale,* 18 N.Y.2d 78, 271 N.Y.S.2d 955 (1966) (4-3 decision); *Frank Ansuini, Inc.* v. *City of Cranston,* 107 R. I. 63, 264 A.2d 910 (1970) (approving a city's authority to require fee dedications, but holding that a requirement that 7% of subdivided land be dedicated was arbitrary, "null and void"); *Jordan* v. *Village of Menomonee Falls, supra,* 28 Wis. 2d at 618, 137 N.W.2d at 448; *Prudential Trust Co.* v. *City of Laramie,* 492 P.2d 971 (Wyo. 1972).

In determining the constitutional scope of the zoning police power delegated to local governments in Virginia, we look first to our own enabling statutes. Code § 15.1-465 (Repl. Vol. 1973) authorizes local governments to "adopt an ordinance to assure the orderly subdivision of land and its development" and defines "subdivision" to mean "the division of a parcel of land into three or more lots or parcels of less than five acres each for the purpose of transfer of ownership or building development". Under Code § 15.1-466(f) (Repl. Vol. 1973), such ordinance may include provisions "[f]or the acceptance of dedication for public use of any right-of-way located within any subdivision which has constructed therein, or proposed to be constructed therein, any street, curb, gutter, sidewalk, drainage or sewerage system or other improvement. . . ." Under Code § 15.1-478 (Cum. Supp. 1974), recordation of a subdivision plat operates "to transfer, in fee simple," to the local government "such portion of the premises platted as is on such plat set apart for streets, alleys, or other public use and to transfer . . . any easement indicated on such plat to create a public right of passage. . . ."

Clearly, the enabling statutes authorize local zoning ordinances which permit local governing bodies to *accept* dedications by *subdividers* for certain public facilities. Arguably, the language of the

*Com'n,* 26 Ohio App. 2d 171, 176, 270 N.E.2d 370, 374 (1971); *Jordan* v. *Village of Menomonee Falls,* 28 Wis. 2d 608, 618, 137 N.W.2d 442, 448, *app. dism'd,* 385 U.S. 4 (1966). *See generally,* I. M. Heyman and T. K. Gilhool, "The Constitutionality of Imposing Increased Community Costs on New Suburban Residents Through Subdivision Exactions", 73 YALE L. J. 1119 (1964); J. W. Reps and J. L. Smith, "Control of Urban Land Subdivision", 14 SYRACUSE L. REV. 405 (1963); Annot., 43 A.L.R. 3d 862 (1972).

statutes would support an inference that local governing bodies, in the exercise of their authority to grant or withhold subdivision approval, are empowered to require an offer and acceptance of dedications for access roads and other public facilities as the price of property development. Indeed, on brief, the landowners "recognize the right of local governments to require adequate public access to lots subdivided and sold to the public." But that question, with its constitutional implications, is not before us and we do not decide it.

We are not concerned with the creation of a subdivision but with development of individually-owned parcels of land. The precise question before us is whether a local governing body has the power to enact a zoning ordinance that requires individual landowners, as a condition to the right to develop their parcels, to dedicate a portion of their fee for the purpose of providing a road, the need for which is substantially generated by public traffic demands rather than by the proposed development.[6] Our enabling statutes delegate no such power.[7] Moreover, Article I, § 11, of the Constitution of Virginia expressly and unequivocally provides "that the General Assembly shall not pass any law . . . whereby private property shall be taken or damaged for public uses, without just compensation."[8] The dedi-

---

[6] The substantial need the service road is designed to serve is not that of the landowners; their properties abut Route 60, and they already have full access. It is true that the landowners may derive some benefit if the service road is completed in its entirety, an eventuality conditioned upon individual landowner decisions to develop every parcel in B-2. The Board's evidence shows that the primary need for the service road arises from the projected increase in tourist travel between Williamsburg and Busch Gardens.

[7] Courts in other jurisdictions have reached a similar conclusion. *See, Admiral Development Corp.* v. *City of Maitland,* 267 So.2d 860 (Fla. D. Ct. App. 1972); *Coronado Development Co.* v. *City of McPherson,* 189 Kan. 174, 368 P.2d 51 (1962); *Baltimore County* v. *Security Mortgage,* 227 Md. 234, 175 A.2d 755 (1961); *Gordon* v. *City of Warren Plan. & Urb. Renew. Com'n,* 388 Mich. 82, 199 N.W.2d 465 (1972); *West Park Ave., Inc.* v. *Ocean Tp.,* 48 N.J. 122, 224 A.2d 1 (1966); *Sanchez* v. *City of Santa Fe,* 82 N.M. 322, 481 P.2d 401 (1971); *Haugen* v. *Gleason,* 226 Ore. 99, 359 P.2d 108 (1961); *City of Corpus Christi* v. *Unitarian Church,* 436 S.W.2d 923 (Tex. Civ. App. 1968).

[8] On May 18, 1974, the Colonial Williamsburg Foundation entered into a written agreement with the county to deed to the county or its designees a portion of its land adjoining the southern boundary of the subject property. On brief, the Board said that "because the Ordinance . . . required the landowners to dedicate 55' of their property fronting on U. S. Route 60 to the County . . . for an access road . . . the County made arrangements to add a strip of land to the landowners' property to the south insofar as possible to replace the strip of land that it was restricting to the north." The record shows that not all landowners will receive an acreage rebate equivalent to the acreage dedicated, and the record is devoid of evidence showing

cation requirement of 8A offends that constitutional guarantee, and we hold that it is invalid.

## B. CONSTRUCTION AND MAINTENANCE

■ B-2 landowners are also required to construct the service road, curbs, and sidewalk at a cost of $37.13 per lineal foot (or $268,439.00 for the entirety) and to landscape and maintain the median strip on the land dedicated to the county. Although 8A does not speak to the question, we assume, as did witnesses for the Board, that once the road is constructed, it is to be maintained by the state.

As the Board says, the police power is "elastic". But its stretch is not infinite. If it were, no property right, indeed, no personal right, could co-exist with it.

> "The protection of private property in the Fifth Amendment pre-supposes that it is wanted for public use, but provides that it shall not be taken for such use without compensation. A similar assumption is made in the decisions upon the Fourteenth Amendment. [Citation omitted]. When this seemingly absolute protection is found to be qualified by the police power, the natural tendency of human nature is to extend the qualification more and more until at last private property disappears. But that cannot be accomplished in this way under the Constitution of the United States.
> ". . . We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." *Pennsylvania Coal Co.* v. *Mahon,* 260 U.S. 393, 415-16 (1922).

The Board cites nothing in the constitution, enabling statutes, or case law of Virginia which empowers the sovereign to require private landowners, as a condition precedent to development, to construct or maintain public facilities on land owned by the sovereign, when the need for such facilities is not substantially generated by the proposed development.[9] The private money necessary to fund the per-

equivalent values. We accept the Board's concession that what it called on brief "a compensatory strip of land" is not a constitutionally sufficient substitute for "just compensation".

[9] Just as we do not decide whether, when land is subdivided as defined in Code § 15.1-465, local governments are empowered by necessary implication of the language

formance of such requirements is "property", and we hold that such requirements violate the constitutional guarantee that "no person shall be deprived of his life, liberty, or property without due process of law. . . ." Constitution of Virginia, Art. I, § 11.

## IV. LAND USE RESTRICTIONS–EQUAL PROTECTION AND DUE PROCESS

In the nomenclature of zoning, "use restriction" is understood to mean a restriction on the type of use to which land may be put. The land use restrictions which we treat in this Part include both qualitative and quantitative restrictions on the right to use land.

When a land use permitted to one landowner is restricted to another similarly situated, the restriction is discriminatory, and, if not substantially related to the public health, safety, or welfare, constitutes a denial of equal protection of the laws. A restriction on the right to use which thus denies equal protection also constitutes a "taking" of one of the most valuable components of the package of private property rights, and, absent just compensation, such taking is a denial of due process of law.

### A. RESTRICTIONS OF BUILDABLE AREA

The "buildable area", i.e., the acreage on which buildings in a B-2 zone may be constructed, is restricted by 8A to what remains after compliance with the 75-foot setback line on the front, the requirement of a 10-foot perimeter open space adjoining the property lines on the sides and rear, and the requirement of a 10-foot perimeter open space adjacent to buildings. The perimeters of open-space areas must be increased (and the buildable area decreased) by one foot for each foot of building height in excess of 35 feet, and no part of such open spaces may be used for automobile parking. The size of the buildable area is also affected by the restriction that no building may be constructed on lots less than 150 feet wide (or 120 feet wide for lots existing on January 10, 1973).

Code § 15.1-486 authorizes local governing bodies to adopt ordinances to "regulate, restrict, permit, prohibit, and determine . . .

of the statutes to require, as the price of subdivision approval, *dedications* for access roads or other public facilities, we reserve decision on that question as it pertains to the power to require *construction* or *maintenance* of such facilities.

[t]he areas and dimensions of land, water, and air space to be occupied by buildings, structures and uses, and of courts, yards, and other open spaces to be left unoccupied by uses and structures . . . ."

Standing alone, this language is broad enough to authorize the use of the police power to impose reasonable restrictions on buildable area. Repeatedly, we have recognized the authority of local governments to adopt setback line restrictions. *French* v. *Town of Clintwood*, 203 Va. 562, 125 S.E.2d 798 (1962); *Nusbaum* v. *Norfolk*, 151 Va. 801, 145 S.E. 257 (1928); *Gorieb* v. *Fox*, 145 Va. 554, 134 S.E. 914, *aff'd.*, 274 U.S. 603 (1926). The power to prescribe reasonable minimum lot width restrictions and open space requirements is clearly within the ambit of Code § 15.1-486, and, by necessary implication from the authority to "regulate", so is the power to require that open spaces on privately-owned land be landscaped and maintained in good condition.

Here, each of these requirements and restrictions on buildable area enjoys the presumption of legislative reasonableness, and the burden of rebutting the presumption, by evidence of the unreasonableness of each, rested upon the landowners. Considering each in isolation from the others, we believe that the landowners failed to overcome that presumption.

However, while local governments have been given the power to enact ordinances imposing such building restrictions and open space requirements, "such ordinances to be valid must be to promote public health, safety, prosperity, morals and public welfare. The mere power to enact an ordinance . . . does not carry with it the right arbitrarily or capriciously to deprive a person of the legitimate use of his property." *Board of Supervisors* v. *Carper, supra*, 200 Va. at 662, 107 S.E.2d at 396.

With the *Carper* rule in mind, we must consider these building restrictions and requirements and examine their cumulative effect.

The landowners' evidence shows that the setback restriction and the open-space requirements would prohibit construction of buildings upon a total of 16.78 acres, or about 29% of the 58 acres classified B-2. Based upon market values prior to the enactment of 8A, the value of the 16.78 acres was $1,959,167.35.

These acreage and valuation computations make no allowance for any restriction of buildable area that may result from surpassing the building height limitation or from reservation of acreage for parking needs. Parking on the service road and open spaces is forbidden. If

businesses are to serve customers, landowners must provide space for parking in some area not reserved for open spaces. That area must be at least as wide as twice the length of an automobile to enable it to maneuver into and out of parking position.

The landowners introduced an expert witness whose testimony, illustrated by exhibits, showed that the buildable area restrictions as a whole rendered 17 of the 51 B-2 lots undevelopable. Disputing this evidence, the Board says that 8 of the 17 lots are developable because two or more adjacent lots are held in common ownership. Since the restrictions are addressed to individual lots, individually assessed and taxed, and since an owner of several lots (any of which he has the right to sell) cannot be deprived of the *beneficial* use of any individual lot, we fail to see how common ownership is constitutionally significant. The Board also argues that, while some of the individually-owned lots are too small for B-2 development, they are large enough to accommodate some productive development under a variance. As we noted in Part I, *supra,* however, if development requires a variance so broad that it violates the "spirit and purpose" of 8A, an application for a variance would be futile.[10]

On cross-examination, the Board's witness, the real estate assessor and financial director of the City of Williamsburg, testified that "[s]ales have stopped after the B-2 zone went into effect." The landowners' witness, a real estate broker, testified that, based upon prior sales of similar property, the market value of the subject property prior to adoption of 8A had been $2.69 per square foot and thereafter had declined to $1.50 per square foot, while the values of neighboring properties had remained constant.

Although, as we have said, we are of opinion that the landowners' evidence was insufficient to overcome the legislative presumption of reasonableness as it pertains to these buildable area restrictions *individually,* we hold that their evidence was sufficient to show that, *collectively,* those restrictions are unreasonable and bear no substantial relationship to the public health, safety, or welfare; that such evidence overcame the presumption of legislative validity; that the Board's evidence of reasonableness was insufficient to make the question fairly debatable; and that the cumulative effect of the restrictions

---

[10] In oral argument, the Board volunteered information that, subsequent to the trial below, a variance (the terms of which were not disclosed) had been granted a B-2 landowner. We will not notice such information *de hors* the record.

upon buildable area was such as "to deprive a person of the legitimate use of his property" in violation of the rule in *Carper*.

## B. *COMMERCIAL USE RESTRICTIONS*

After dividing its jurisdiction into districts, a local governing body may, within each district, "regulate, restrict, permit, prohibit, and determine . . . [t]he use of land, buildings, structures and other premises for agricultural, commercial, industrial, residential, flood plain and other specific uses". Code § 15.1-486.

Here, the Board divided its jurisdiction into districts and placed each in a broad category. Two of these categories are reserved for business uses, and the subject property has been assigned to one of these. We have rejected a constitutional challenge to this classification structure (*see* Part II, *supra*). We now consider whether the sub-classifications the Board made within the category to which the subject property is assigned violate constitutional restraints.

Within the B-2 business classification, 8A separates commercial uses into two distinct sub-classes. Hotels, motels, and theatres are permitted; banks, office buildings, and grocery stores are prohibited. "Antique shops" are permitted; shops selling antique reproductions are prohibited. "Restaurants" are permitted; "fast food" or "drive-in" restaurants are prohibited. Gift shops are permitted, provided they are "accessory to hotels or motels having 50 or more dwelling or lodging units" and are "designed and scaled only to meet the requirements of occupants and their guests"; other retail stores selling identical gifts are prohibited.

Like classifications of districts into broad use categories, sub-classifications of uses permitted and uses prohibited are, to some degree, arbitrary. Such sub-classifications are presumed to be reasonable, but, unless they are substantially related to the public health, safety, or welfare, the restrictions on use offend both the equal protection and due process guarantees.

> "[A] classification cannot prohibit or restrict certain uses and permit other uses where there is no valid basis, reasonably related to the public health, safety, morals, welfare or other proper object of the police power, for distinguishing between them." 8 McQuillin, *supra* at § 25.123 (332).

*See e.g.*, *Frost* v. *Village of Glen Ellyn*, 30 Ill. 2d 241, 195 N.E.2d 616 (1964) (holding exclusion of drive-in restaurant from a business zone unreasonable, arbitrary, and capricious); *Vernon Park Realty* v. *Mount Vernon*, 307 N.Y. 493, 121 N.E.2d 517 (1954) (striking down an ordinance which excluded all uses except vehicular parking).

One of the permissible purposes of a zoning ordinance is "to protect against destruction of or encroachment upon historic areas". Code § 15.1-489. Nothing in the evidence shows that implementation of any of the commercial uses prohibited by 8A would destroy or encroach upon Colonial Williamsburg. Nor is there any evidence that such uses are noxious, dangerous, or otherwise inimical to the public health, safety, or welfare. The exclusion from a zoning district of a particular use, or category of uses, will be upheld where that exclusion is substantially related to a proper exercise of the police power. *Fairfax County* v. *Parker, supra*, 186 Va. at 688, 44 S.E.2d at 15 (upholding a use restriction against a commercial junkyard within a residential district). But 8A excludes a large number of otherwise legitimate retail business uses from a retail business district, when nothing in the record shows that the uses excluded would be more detrimental to the public welfare than the uses permitted.

The trial court ruled that 8A "imposes unreasonable restrictions upon the use of properties within said B-2 zone". Finding no substantial nexus between the commercial use restrictions imposed and the public weal, we are of opinion that the ruling of the trial court was correct; that the evidence was sufficient to overcome the legislative presumption of reasonableness; that the Board's evidence was insufficient to make the question of reasonableness fairly debatable; and that the commercial use restrictions deny B-2 landowners equal protection of the laws and constitute a "taking" of property without due process of law.

## C. *ARCHITECTURAL DESIGN RESTRICTIONS*

■ Under 8A, approval of preliminary site plans is made "conditional, subject to Architectural Design Review procedures as set forth under General Provisions, Article 12, Section 12-13." That article requires the applicant to submit "schematic architectural plans indicating accurate elevations of each facade, and sufficient detailing to indicate materials, colors, texture, light reflecting characteristics, and special features intended for the building." In deciding whether the

proposed building is "acceptable", the five-man Architectural Design Review Board is to be "governed solely by the purposes of architectural design review". These purposes are:

". . . to protect property values and to promote the general welfare by insuring buildings in good taste, proper proportion, in general and reasonable harmony with the existing buildings in the surrounding area, and to encourage architecture which shall be distinct from the Colonial Williamsburg architecture."

Landowners assert that nothing in the enabling statutes delegates authority to local governments to impose restrictions on architectural design. The Board relies upon Code § 15.1-489 which provides that "ordinances shall be designed . . . to facilitate the creation of a convenient, attractive and harmonious community. . . ."

A community in which all buildings are required to conform to a particular design, or one in which a particular design is forbidden to all buildings, may be "convenient, attractive and harmonious". However, a "county cannot limit or restrict the use which a person may make of his property under the guise of its police power where the exercise of such power would be justified solely on aesthetic considerations." *Kenyon Peck* v. *Kennedy*, 210 Va. 60, 64, 168 S.E.2d 117, 120-21 (1969). While the fact that aesthetic considerations entered into the reasons for the passage of an ordinance will not invalidate it, it is valid only "if other elements within the scope of police power are present." *Id.*

The Board argues that "the preservation of the commercial value of an area as a tourist attraction is within the police power of the local government". It is true that Code § 15.1-503. 2(a) (Cum. Supp. 1974) authorizes certain counties, including James City County, to "adopt an ordinance setting forth the historic landmarks within the county" and to create "one or more historic districts adjacent to such landmarks" in which "no building . . . shall be erected . . . unless the same is approved by the board of supervisors of such county as being architecturally compatible with the historic landmark. . . ." However, for two reasons this statute does not give the Board the police power it claims. First, the statute expressly provides that "[n]o such historic district shall extend further than one-quarter mile from the property line of the land pertaining to any such historic landmark", and, as the parties stipulated, the Board has never adopted any

ordinance designating any historical landmark within one-quarter mile of the B-2 zone. Second, the only architectural design power delegated to the county is the power to require architectural design "compatible with the historic landmark"; here, the requirement is that architectural design be "distinct from" the landmark.

Some jurisdictions have adopted the rule upholding architectural design regulations when it appears that the purpose of the ordinance was to protect property values within the zone. *State* v. *Berkeley*, 458 S.W.2d 305 (Mo. 1970); *Reid* v. *Architectural Board of Review*, 119 Ohio App. 67, 192 N.E.2d 74 (1963); *Saveland Park Holding Corporation* v. *Wieland*, 269 Wis. 262, 69 N.W.2d 217, *cert. denied*, 350 U.S. 841 (1955). We decline to follow this rule when, as here, it appears that the predominant purpose of the ordinance was to promote aesthetic values and the purpose recited in the ordinance to protect property values was merely an incidental goal.

Finding nothing in the enabling statutes which delegates to the Board the power it claims, we hold that the Board was without authority to impose the architectural design restrictions incorporated in 8A and that, as the trial court ruled, 8A "includes purposes and provisions not authorized by law". In light of our holding, it is unnecessary to consider whether the standards governing the exercise of the leigslative power delegated by the Board to the Architectural Design Review Board were unconstitutionally vague.

## V. *EVIDENTIARY ISSUES*

The Board says that the trial court committed error in admitting evidence "regarding the effect of the zoning ordinance upon specific, individual parcels of land within the B-2 zone"; testimony "regarding property values on Route 60 West outside the B-2 District"; and exhibits used by the landowners' expert witness to illustrate his testimony.

The Board also contends that the trial court erred in refusing to permit its witness to testify concerning a third-party study of present and projected traffic conditions and in refusing to permit another witness "to clarify, qualify, explain, rebut and impeach" the testimony of the landowners' witness concerning the value of certain lots in the B-2 zone.

The trial judge sat without a jury. Nothing in the record indicates that his final judgment order was based on inadmissible testimony or that any evidence proffered and excluded was essential to a fair

determination of the dispositive issues before him. We are of opinion that none of his evidentiary rulings constituted reversible error.

## VI. SEVERABILITY

Relying upon the severability clause contained in Article 16 of the James City County Zoning Ordinance, the Board asks us to sever those portions of 8A which we have found unconstitutional in order to preserve what remains.[11]

Paraphrasing the Supreme Court's language in *Carter* v. *Carter Coal Co.*, 298 U.S. 238, 312-13 (1936), quoted with approval in *Hannabass* v. *Maryland Cas. Co.*, 169 Va. 559, 571, 194 S.E. 808, 813 (1938), we posit the rules concerning severability. Absent a severability provision, a legislative act is presumed to be non-severable, and the burden of proving severability is upon the supporter of the legislation. Where a severability provision is included, a legislative act is presumed to be severable, the burden of proving non-severability is on the assailant of the legislation, and the presumption of severability must be overcome by considerations which establish the clear probability that the legislature would not have been satisfied with what remains after elimination of the invalid parts. Whether there is or is not a severability provision, "the determination, in the end, is reached by applying the same test—namely, What was the intent of the lawmakers?" 169 Va. at 571, 194 S.E. at 813. While the presence of a severability provision "provides a rule of construction which may sometimes aid in determining [legislative] intent . . . it is an aid merely; not an inexorable command." *Dorchy* v. *Kansas*, 264 U.S. 286, 290 (1924).

---

[11] Eight months after the landowners filed their motion and about one month before trial, the Board adopted a new severability provision which reads as follows: ". . . This ordinance shall be liberally construed so as to effectuate the purposes hereof. If any clause, sentence, paragraph, section or subsection of this ordinance shall be adjudged by any court of competent jurisdiction to be invalid for any reason, including a declaration that it is contrary to the Constitution of the Commonwealth of Virginia or of the United States, or if the application thereof to any government, agency, person, or circumstance is held invalid, such judgment or holding shall be confined in its operation to the clause, sentence, paragraph, section or subsection hereof or the specific application hereof, directly involved in the controversy in which the judgment or holding shall have been rendered or made, and shall not in any way affect the validity of any other clause, sentence, paragraph, section or subsection hereof, or affect the validity of the application thereof to any other government, agency, person or circumstance."

Here, the Board enjoys the presumption of severability. To determine whether that presumption has been overcome, we must look to see what parts of 8A remain after the parts we have found invalid are eliminated.

The parts we have found invalid include: the dedication requirement; the requirement of construction of the service road, curbs, and sidewalk; the requirements of landscaping and maintenance of the median strip on the dedicated land; the restrictions on buildable area, collectively applied; the restrictions on commercial use; and the architectural design review procedures.

The parts that remain include: one or more of the restrictions on buildable area, including the setback line restriction, the open space requirements, the minimum width lot requirement, the building height provisions, and the parking regulations, provided the effect of the collective application of more than one such restriction, provision, or regulation is not so great as "to deprive a person of the legitimate use of his property"; the requirement of landscaping and maintenance of open spaces on privately-owned property; the special regulations for underground utilities and above-ground utility facilities; the outdoor sign regulations; the site plan review requirement; and the variance and waiver clauses.

We hold that the presumption of severability has been overcome. The parts eliminated are crucial to the purpose and spirit of the ordinance. Indeed, they are the vital organs of the legislative creature. The remaining parts are mere appendages, and, when severed, are wholly without significant function. We confidently believe that the Board of Supervisors of James City County would not have enacted an ordinance containing only what now remains of 8A. Under the rules cited above, we hold that the trial court did not err in striking down 8A in its entirety.

\* \* \*

We have found no reversible error, and the final decree entered June 12, 1974, is affirmed.

However, since the enactment of 8A repealed the B-1 classification of the subject property and the effect of the final decree was to leave the land unzoned, the cause must be remanded to the trial court under instruction to enter another decree. The new decree will suspend the effective date of the June 12, 1974, decree for a prescribed period of time and direct the Board to consider further legislative action. The new decree will enjoin the Board during that period from taking

any action inconsistent with this opinion. The new decree will further provide that, if the Board fails to comply within the prescribed period, the June 12, 1974, decree will become effective and the injunction will become permanent.

*Affirmed and remanded.*