PRESENT:  All the Justices

COUNTY OF ISLE OF WIGHT

v.  Record No. 211032

OPINION BY
JUSTICE STEPHEN R. McCULLOUGH
December 29, 2022

INTERNATIONAL PAPER COMPANY,
A NEW YORK CORPORATION

FROM THE CIRCUIT COURT OF ISLE OF WIGHT COUNTY
Carl Edward Eason, Jr., Judge

On remand from this Court's decision in *International Paper Co. v. County of Isle of Wight* (*International Paper I*), 299 Va. 150 (2020), the circuit court held that International Paper had established, by a preponderance of the evidence, that the County's tax scheme violated the requirement of the Constitution of Virginia that taxation be uniform.  The circuit court ordered a full refund of International Paper's machinery and tools tax ("M&T tax") for the applicable year. The County appeals from this decision, contending that the circuit court erred in finding its tax scheme unconstitutional, and, in the alternative, that it erred in the relief it granted.  For the following reasons, we disagree with the County and affirm the circuit court's judgment across the board.

BACKGROUND

I.      THE FIRST REFUND ACTION AND ITS AFTERMATH.

Our prior decision sets forth the extensive background of this case.  We focus on the facts and proceedings essential to our resolution of the issues before us.  International Paper owns a sizeable paper production factory in Isle of Wight County.  The Company must pay M&T tax to the County for the machinery and tools it uses in this factory.  *International Paper I*, 299 Va. at 157.

International Paper challenged the valuation of its machinery for tax years 2012-14, claiming the County had valued the machinery above its fair market value. *Id.* at 158. International Paper prevailed in its challenge, and it obtained a refund of $2.4 million. *Id.*

While this refund action was pending, an expert advised the County that its assessment of machinery and tools at 100% of original capitalized costs resulted in valuations of this equipment at more than fair market value. *Id.* The Commissioner of the Revenue of the County, Gerald Gwaltney, thereafter changed the valuation methodology for machinery and tools in the County. *Id*. at 158-59. The County retroactively corrected its M&T tax assessment for the tax years 2013, 2014, and 2015. *Id.* at 159. The County then issued refunds totaling roughly $5.6 million. *Id.* These refunds, in turn, created an unanticipated and significant budgetary shortfall for the County. *Id.* at 159-60.

II.     THE COUNTY IMPLEMENTS A NEW STRATEGY TO CLOSE THE BUDGET SHORTFALL.

On January 6, 2017, the County Administrator sent a letter to taxpayers who had paid M&T tax. *Id.* at 159. The letter stated in pertinent part:

> The amount of the refunds was not anticipated in this year's
> Operating Budget and will create a potential deficit that the board
> is now taking steps to address. One of the anticipated steps is an
> increase in the M&T tax rate for the County's fiscal year 2017-18
> budget. The adjustment will only be for tax year 2017.
>
> We have estimated that any tax increase over the current tax
> amount will be very close to the amount of the refund you have
> just received.

*Id*. at 159-60.

Commissioner Gwaltney proposed a solution to close the budget shortfall. *Id*. at 160. He suggested to the County Board of Supervisors that the tax rate for machinery and tools should be significantly increased, but only for one year. *Id.* This tax rate would "be accompanied by some

2

type of payment program" for the taxpayers that would "'offset any net increase' in M&T tax assessments." *Id.*

The Board agreed and, on May 11, 2017, increased the M&T tax rate to $4.24 per $100 of assessed value for tax year 2017. *Id.* On June 15, 2017, just a few weeks after the tax increase, the Board adopted a resolution that authorized an "economic development retention grant program." This program would benefit certain M&T taxpayers. *Id.* The relevant part of the resolution stated:

> WHEREAS, in cooperation with the Board of Supervisors, the Commissioner of the Revenue adjusted the County's M&T tax assessments for multiple tax years and made appropriate adjustments of tax amounts for prior years including 2016; and,
>
> WHEREAS, in an effort to mitigate the impact on County revenues resulting from the adjustment to M&T taxes, *the Board of Supervisors adopted a* [ ] *one-year adjustment to the machinery and tools tax rate for FY2017-18 with the intent that any businesses negatively impacted by the adjustment would be eligible for an Economic Development Retention Grant.*
>
> NOW, THEREFORE, BE IT AND IT IS HEREBY RESOLVED that the Board of Supervisors of the County of Isle of Wight, Virginia authorizes the issuance of Economic Development Retention Grants in the cumulative amount of [$32,125] to businesses *negatively impacted by the adjustment to the M&T tax.*

*Id.* at 160-61 (emphasis and alterations in original). In *International Paper I*, we characterized the Economic Development Retention Grants as the "M&T Tax Relief Program." *Id.* at 160.

Later that summer, on July 17, 2017, the Board adopted a resolution that amended its operating and capital budgets. This resolution states, in relevant part:

> BE IT FURTHER RESOLVED that machinery and tools tax revenues in the amount of $5,149,571 be appropriated to the FY2017-18 General Fund Non-Departmental Reserves – Fund Balance.

3

> BE IT FURTHER RESOLVED that machinery and tools tax revenues in the amount of $1,164,274 be appropriated to the FY2017-18 General Fund Operating Budget to provide Economic Development Incentive Grants.

*Id.* at 161.

The M&T Tax Relief Program was thus funded with $32,125 in appropriations as well as approximately $1.16 million that was raised from the increased 2017 M&T tax. *Id.*

The County did not mail separate checks under its M&T Tax Relief Program. Rather, it automatically credited the amounts on taxpayers' M&T tax bills. *Id.* M&T taxpayers could receive a credit against the amount of their 2017 M&T tax assessment. *Id.* This credit was equal to the amount that their M&T taxes increased, due to the higher 2017 tax rate (the difference between the amount owed under the then current $4.24 rate per $100 of assessed value, minus the amount that would have been owed under the 2016 M&T tax rate of $1.75 per $100 of assessed value), reduced by the refund amounts for M&T tax years 2013-15 received by the taxpayer. *Id.* The net effect of this approach is that the only taxpayers who had to pay the significantly increased M&T tax rate were the ones who received refunds, and the increased amounts they owed were limited to the amount of the M&T tax refund they had received from the County.

In the words of the Board, "any business negatively impacted by the adjustment" received an M&T Tax Relief Program "grant." *Id.* at 162. This grant prevented those who were negatively impacted from having to shoulder the burden of the tax increase. *Id.* The County did not consider taxpayers to be negatively impacted merely because they had to pay a tax equal to the amount of the refund they had received from the County. *Id.*

For tax year 2017, International Paper received an M&T tax bill from the County in the amount of $5,485,481.82. *Id.* The County reached this figure by (1) assessing International

4

Paper's machinery and tools at a value of $139,386,552; (2) applying the tax rate of $4.24 per $100 of assessed value, and (3) reducing this amount with the M&T Tax Relief Program formula. *Id.*

III.    THE SECOND REFUND ACTION.

International Paper filed a second refund action, alleging among other things that the County's tax and retention grant scheme violated the uniformity requirement of the Virginia Constitution. *Id.* In a bench trial, International Paper presented the following evidence in support of this claim.

First, it offered into evidence the documentation noted above concerning the adoption of the tax rate and the M&T tax program. *Id.* at 163-64. International Paper also introduced into evidence two spreadsheets that demonstrated the County's assessed values of machinery and tools, the amount the County paid in its M&T Tax Relief Program, and the tax bills for all M&T taxpayers in the County for 2017. *Id.* at 164.

International Paper also adduced the testimony of the County Attorney, Mark Popovich. *Id.* He explained that the purpose of the M&T Tax Relief Program was to avoid a situation where M&T-owning businesses would leave the County. He stated that the M&T Tax Relief Program was a one-time, "unique, [and] specific situation." *Id.* (alteration in original). He noted that the County had not enacted such a measure before. *Id.* He explained that the funds from M&T tax revenue went into the County's general fund, but that revenue from this source later became a "restricted" amount that was dedicated to the M&T Tax Relief Program. *Id.*

Popovich testified concerning the way the County calculated the payment amounts for the M&T Tax Relief Program. *Id.* Using the 2017 rate of $4.24 per $100 of assessed value, the County first calculated each taxpayer's potential 2017 M&T tax liability. *Id.* This provided the

5

initial M&T tax calculation for 2017. *Id.* Next, the County determined the amount each taxpayer would owe under the 2016 M&T tax rate of $1.75 per $100 of assessed value, which established a hypothetical 2016 M&T tax calculation. *Id.* The County subtracted the hypothetical 2016 M&T tax calculation from the initial 2017 M&T tax calculation, which allowed the County to determine the net tax increase the M&T taxpayer faced due to the 2017 increase in the tax rate. *Id.* at 164-65. The County then subtracted the M&T tax refund amount the taxpayer received for M&T tax years 2013-15 from the amount of the net tax increase to determine the amount of the relief granted to the M&T taxpayer, as contemplated by the M&T Tax Relief Program. *Id.* at 165. If the M&T Tax Relief Program formula produced a negative amount of tax relief—because the amount of the tax increase was less than the refund which had been received—the taxpayer did not receive any M&T tax relief. *Id.* If the amount was a positive number, the County automatically deducted the relief amount from the M&T taxpayer's initial 2017 M&T tax calculation, which was based on the $4.24 per $100 tax rate. *Id.*

According to Popovich, the County gave relief payments to any M&T taxpayer who experienced a net M&T tax increase that was greater than the amount of the M&T tax refund the taxpayer had received for tax years 2013-15. *Id.* For any M&T taxpayer which did not receive a tax refund for tax years 2013-15, the amount that such taxpayer paid—after subtracting the M&T tax relief amount—would be the same amount as if there had been no increase of the M&T tax rate in 2017. *Id.*

Popovich then explained the method the County employed to calculate International Paper's 2017 M&T tax bill. *Id.* First, the County valued International Paper's M&T property at $139,386,552 for tax year 2017. *Id.* Under $4.24 rate, the initial 2017 tax calculation was $5,909,989. *Id.* Under the $1.75 rate, International Paper's hypothetical 2016 M&T tax due

6

would be $2,439,264.  *Id.*  International Paper's net M&T tax increase from tax years 2016 to 2017 was $3,470,725 ($5,909,989 minus $2,439,264).  *Id.*  The County paid International Paper tax refunds totaling approximately $3,046,217 for M&T tax overpayments during tax years 2013-15.  *Id.*  Subtracting the refund amount, $3,046,217, from the net increase amount, $3,470,725, reduced the amount of M&T tax relief due to International Paper and yielded a relief payment amount of $424,508.  *Id.* at 165-66.  International Paper thus received a net 2017 M&T tax bill of $5,485,481 (initial 2017 M&T tax calculation of $5,909,989 minus M&T tax relief amount of $424,508 equals the amount of M&T tax owed--$5,485,481).  *Id.* at 166.

Commissioner Gwaltney also testified.  *Id.*  He explained that the County had approximately 100 M&T taxpayer accounts in tax year 2017.  *Id.*  In proposing the $4.24 M&T tax rate and M&T Tax Relief Program to the Board, Gwaltney's objective was to close the budget gap caused by the issuance of the tax refunds for tax years 2013-15, while also ensuring that no M&T taxpayer "would be harmed" by having to pay any more than they had received in refunds as a result of increased tax rates.  *Id.*  According to Gwaltney, the retention grants were provided to encourage M&T-owning businesses to stay in the County despite the tax increase for the 2017 year.  *Id.*

Thomas Elder, Jr., who manages the County's economic development office, also testified.  *Id.*  The economic development office promotes and seeks to retain businesses in the County.  *Id.*  Elder stated that his office has previously issued economic stimulus payments, but that the economic development office was not involved with the design and implementation of the M&T Tax Relief Program.  *Id.*

Finally, Guy Davis testified as an expert in forensic accounting and financial investigations.  *Id.*   Davis stated that the two components of the County's approach, the 2017

7

M&T tax increase and the M&T Tax Relief Program, "were implemented for [the 2017 M&T tax] year, and they both expired at the end of that year." *Id.* (alteration in original). According to Davis, the County's approach created disparate tax rates among M&T taxpayers. *Id.* Davis testified that 39 M&T taxpayer accounts paid M&T taxes according to the $4.24 rate, 28 accounts paid according to a $1.75 rate, and 33 accounts paid according to a rate somewhere between the $4.24 and $1.75 rates. *Id.* 166-67. Davis testified that, for example, International Paper paid a tax rate of $3.94 per $100 of assessed value of its M&T property, while another M&T taxpayer, Cashin Systems, paid a rate of $2.76 per $100 of assessed value. *Id.* at 167.

According to Davis, the principal reason for the disparate tax rates was the M&T Tax Relief Program component of the County's strategy. *Id.* The County's strategy ensured that the amount the taxpayer faced from increased taxes was not more than the amount the taxpayer received in a refund for tax years 2013-15. *Id.* It was Davis's opinion that the County's strategy in 2017 "resulted in a 100 percent recovery of the refunds that were paid" for tax years 2013-15. *Id.* The two-part tax plan allowed the County to keep the amount of M&T tax revenue that was necessary to close the deficit caused by the tax refunds. *Id.* Davis noted that "neither . . . the refund that was paid, nor the incremental [M&T] tax that was changed was included as a budgeted revenue or a budgeted disbursement." *Id.* (alteration in original).

At the conclusion of International Paper's case in chief, the circuit court granted the County's motion to strike. *Id.* at 168. International Paper appealed.

IV.     OUR DECISION IN *INTERNATIONAL PAPER I* AND THE PROCEEDINGS ON REMAND.

In *International Paper I* we reversed the decision of the circuit court. We analyzed the purpose and effect of the tax rate when combined with the M&T Tax Relief Program and concluded that International Paper had established a prima facie case that "the M&T Tax Relief

8

Program operated effectively as a partial tax exemption that was part of the 2017 M&T taxation process, and that International Paper's 2017 M&T tax assessment was non-uniform, invalid, and illegal." *Id.* at 190. We reversed the circuit court's decision to grant the County's motion to strike, and we remanded the case for further proceedings. *Id.*

On remand from this Court, the circuit court held a hearing. The only evidence offered by the County was a request for admission, which showed that for tax year 2017, International Paper owned machinery and tools within the County that was subject to taxation. The parties then presented argument.

The circuit court held that International Paper had "established by a preponderance of the evidence that there was [a] clear linkage between the tax rate established, and the economic development retention grant program . . . and that these two legislative acts produced an unconstitutional effect." The unconstitutional effect was a non-uniform tax. The circuit court declined to sever the grant retention program from the underlying tax rate. The court concluded that International Paper was entitled to a refund in the amount of $5,485,481.81, the entirety of the M&T tax it paid in 2017, plus interest. We awarded the County an appeal from that judgment.

## ANALYSIS

The County raises a number of assignments of error, but they center on two points. First, the County argues that its tax scheme, consisting of a high tax rate combined with what it called Economic Development Retention Grants, was not unconstitutional. Second, it contends that even if the combined effect of its scheme resulted in unconstitutional non-uniformity, the circuit court erred in fashioning a remedy.

I.    AMPLE EVIDENCE SUPPORTS THE CIRCUIT COURT'S CONCLUSION THAT THE COUNTY'S TAX SCHEME WAS NON-UNIFORM.

9

The County contends that the circuit court misapplied the presumption of constitutionality that attaches to its enactments. Instead of striking down the tax as non-uniform, the County argues, the circuit court should have adopted a different interpretation of the combined effect of the tax rate and the Economic Development Retention grants, i.e. the M&T Tax Relief Program. The County argues that the M&T tax rate and the Economic Development grants "were separate, not entangled legislative acts." County Br. 43.

Resolving this question turns on our review of the evidence before the circuit court. "On appeal, we view the evidence and all reasonable inferences arising therefrom in the light most favorable to the prevailing party at trial." *McKee Foods Corp. v. Cnty. of Augusta*, 297 Va. 482, 495 (2019). Here, International Paper was the prevailing party. As for the circuit court's judgment concerning the constitutionality of the County's M&T Tax Relief Plan, its decision on that question is reviewed de novo. *International Paper I*, 299 Va. at 170.

"It is a settled principle of law that all statutes and ordinances are presumed to be constitutional, and that if there is any doubt such doubt should be resolved in favor of their constitutionality." *Town of Ashland v. Board of Supervisors*, 202 Va. 409, 416 (1961). The presumption of constitutionality does not mean that a circuit court is required to disbelieve evidence and argument showing that the enactment in question is unconstitutional, nor does it mean that a court must accept the government's evidence and argument. The presumption means that a litigant who is challenging the constitutionality of an enactment must shoulder the burden of proving, through arguments and evidence, that the enactment is unconstitutional. *See Colonial Pipeline Co. v. Commonwealth*, 206 Va. 517, 523 (1965) (explaining that given the "presumption of the constitutionality of a statute . . . the burden is upon the assailing party to prove its invalidity").

Article X, Section 1 of the Constitution of Virginia provides that:

> All property, except as hereinafter provided, shall be taxed. All taxes shall be levied and collected under general laws and *shall be uniform upon the same class of subjects* within the territorial limits of the authority levying the tax.

(Emphasis added.)

In *International Paper I*, we concluded that the company had established a prima facie case that the County's interwoven taxation scheme was non-uniform. 299 Va. at 190. On remand, the circuit court found the company's evidence credible and ruled in its favor. We have little difficulty concluding that, under the standard of review, the circuit court's judgment must be affirmed. International Paper marshalled ample evidence to prove that the higher tax rate and the Economic Development Retention Grant Program were integrated and interwoven and resulted in non-uniform taxation. As we noted in *International Paper I*, the company established that:

- the express purpose of the M&T Tax Relief Program was to relieve liability for the 2017 M&T tax rate increase;

- the M&T Tax Relief Program had a purpose, at least in part, to relieve from liability for the 2017 M&T tax a sub-class of M&T taxpayers deemed by the County to be harmed by the M&T tax rate increase;

- the M&T Tax Relief Program was structured to directly exempt M&T taxpayers from liability, and the County's economic development office played no part in the creation or implementation of the program;

- the payments from the M&T Tax Relief Program directly offset M&T tax liability and were subtracted from each taxpayer's bill;

11

- the one-time M&T Tax Relief Program factually correlated with the 2017 M&T tax rate increase to $4.24 per $100 of assessed value, and the program was enacted shortly after the tax increase and applied to the same time period;

- the M&T Tax Relief Program was primarily funded by the 2017 M&T tax rate increase; and

- the amount of the "grant" was determined by each taxpayer's net tax increase, and thus the M&T Tax Relief Program correlated with the 2017 M&T tax process.

In *International Paper I*, we held that this evidence established a prima facie case of a non-uniform tax. On remand, the County presented no new evidence. Evaluating this evidence on remand, the circuit court could find this evidence persuasive and reach the conclusion that the County had established that the Economic Retention Grant Program and the elevated tax rate worked in tandem and, consequently, that the County's M&T tax was non-uniform.

II.   THE CIRCUIT COURT DID NOT ERR IN REFUSING TO SEVER THE ECONOMIC DEVELOPMENT RETENTION GRANTS FROM THE TAX RATE.

The County next contends that the circuit court erred in fashioning a remedy. Specifically, the County argues that the circuit court should have invalidated the Economic Development Retention Grants, i.e. the 2017 Tax Relief Program, and imposed a tax rate of

12

$4.24 per $100 of assessed value.[1] The County and its amici[2] invoke principles of severability. Ordinarily, severability analysis asks whether a specific problematic section or subsection of a unitary statute can be separately stricken and the remainder preserved or whether an entire statute must fall due to the invalidity of a portion of the statute. This case presents us with two separate enactments. However, the enactments are interrelated and serve complementary purposes. Therefore, we conclude that severability principles inform our decision as to whether the Tax Relief Program can be invalidated and the tax rate should be allowed to stand.[3]

There are times when an illegal provision can be feasibly severed from the overall taxation scheme. *Compare City of Richmond v. Beltway Properties, Inc.*, 217 Va. 376, 379-80 (1976) (illegal portion of tax statute could not be severed), *with City of Portsmouth*, 216 Va. at 699 (illegal portion of tax statute could be severed). In *Board of Supervisors v. Rowe*, 216 Va. 128, 148 (1975), we framed the severability question as follows: if a court were to sever the illegal portion of an enactment, would the lawmakers have enacted an ordinance containing what remains? If so, the illegal portion can be severed; if not, it should not be severed, and the entire

---

[1] The County urges us to engage in a "step-by-step" analysis with respect to the County's enactments to determine at which step nonuniformity occurs. In practice, this would mean that a reviewing court should look first to the tax rate, in this instance, $4.24 per $100 of assessed value, to determine whether it is lawful. According to the County, if the next step, applying the Economic Retention Grant program, renders the tax non-uniform, the court should disregard the grant program. Here we are confronted with two binding and interrelated enactments, a tax rate and an Economic Retention Grant program. In that circumstance, rather than apply the County's novel "two-step" approach, we instead look to severability principles to inform our decision concerning whether the tax rate should be allowed to stand without its related Tax Relief Program.

[2] The brief amicus curiae was filed by the Local Government Attorneys of Virginia, the Virginia Municipal League, the Virginia Association of Counties, the Virginia Association of Assessing Officers, and the Commissioners of the Revenue Association of Virginia.

[3] The County Code contains a severability provision for its ordinances, but not for resolutions. *See* Isle of Wight County Code § 1-6.

13

enactment should be stricken. In *Rowe*, we answered the question in the negative, reasoning that the portions proposed to be "eliminated are crucial to the purpose and spirit of the ordinance." *Id.*

In the present case, the circuit court found that there was a "clear linkage between the tax rate . . . and the . . . grant program." Abundant evidence established that the two were enacted together to serve a complementary purpose, that the tax rate and the grant program operated in tandem with one another. The manifest intent of the County Board of Supervisors was not simply to enact a high tax rate at $4.24 per $100 of assessed value; it was to impose a high rate of taxation which would then be mitigated through the economic retention grants. In light of the overwhelming evidence of the interwoven purpose and operation of the high tax rate and the economic retention grants, we conclude that invalidating the Tax Relief Program while preserving the high tax rate would not be an appropriate remedy. *See Heublein, Inc. v. Dep't of Alcoholic Beverage Control*, 237 Va. 192, 200-01 (1989) (declining to sever any portion of the statute containing unconstitutional provisions where severance would thwart the underlying object of the statute); *see also Archer Daniels Midland Co. v. State*, 315 N.W.2d 597, 600 (Minn. 1982) (declining to sever an unconstitutional tax exemption for in-state producers of gasohol, thereby extending it to all producers, when the legislative intent was to benefit in-state firms).[4]

---

[4] We find no merit to the County's argument that the circuit court improperly grounded its decision in equitable principles. The circuit court cited Code § 58.1-3987 in its opinion. Although the circuit court's memorandum opinion contains some statements pointing out the unfairness of the County's position, i.e., that International Paper should be the lone taxpayer to pay the high rate of taxation and that it should in effect be punished for successfully challenging an illegal assessment, the circuit court based its judgment on sound principles of law.

14

III.    THE CONTENTION THAT INTERNATIONAL PAPER SHOULD PAY A "LEGACY" TAX RATE OF $1.75 PER $100 OF ASSESSED VALUE IS PROCEDURALLY DEFAULTED.

Having rejected the County's argument that we should sever the 2017 Tax Relief Program from the $4.24 tax rate, there remains the question of what alternative remedies the County could have pursued to recover some M&T tax from International Paper. Code § 58.1-3987 affords circuit courts broad remedial authority. It provides, in relevant part, that

> [f]or the purpose of reducing or increasing the assessment and adjusting the taxes the court shall have all the powers and duties of the authority which made the assessment complained of, as of the time when such assessment was made, and all powers and duties conferred by law upon such authority between the time such assessment was made and the time such application is heard.

Amici suggest in their brief that, should this Court decline to sever the grant retention program from the tax rate, the appropriate remedy would be to require International Paper to pay a tax rate of $1.75, which it contends represents the "legacy" tax rate. Amicus Br. at 18. Counsel for the County invoked this possibility at oral argument. As the County acknowledged, however, it did not advance this argument at trial. Under Rule 5:25, "[n]o ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling." There is an exception, rarely applied, to this rule of procedural default, and that is when the appellant has shown "good cause . . . or to enable this Court to attain the ends of justice." *Id.*; *see Gheorghiu v. Commonwealth*, 280 Va. 678, 689 (2010) (noting that this Court has "applied the ends of justice exception . . . in very limited circumstances"). The County does not articulate any good cause, nor does it invoke "the ends of justice."

The rules of this Court should be consistently applied, and the County must now live with the choices it made during this litigation. At trial, the County asked the court to uphold both the

15

$4.24 tax rate and the Economic Development Retention Grants, or, in the alternative, to strike the grant program and uphold the higher tax rate. It did not pursue alternative arguments. Under these circumstances, we decline to reach the question of whether the circuit court could have or should have, if asked, imposed as a remedy an effective tax rate of $1.75.[5]

CONCLUSION

For the foregoing reasons, the decision of the circuit court will be affirmed.

*Affirmed and final judgment.*

---

[5] We also reject the County's argument that the circuit court's judgment is invalid because it results in International Paper paying no M&T tax for tax year 2017. The County points to the requirement found in Article X, Section 1 of the Virginia Constitution that "[a]ll property . . . shall be taxed." We disagree with this argument for two reasons. First, the requirement that all property should be taxed presupposes a lawful regime of taxation. Second, the County had at its disposal alternative arguments for the recovery of some M&T taxes, but it did not advance those arguments at trial.

16