# Richmond

### Board of County Supervisors of Fairfax County, Virginia v. G. Wallace Carper, Et Al.

### H. Graham Morison, Et Al. v. G. Wallace Carper, Et Al.

March 16, 1959.

Record Nos. 4865, 4869.

Present, All the Justices.

654

The opinion states the case.

*Armistead L. Boothe* (*William W. Koontz; Boothe, Dudley, Koontz & Boothe,* on brief), for plaintiff in error, Board of County Supervisors of Fairfax County.

*Roger Fisher* (*H. Graham Morison; F. Shield McCandlish; Livingston, McCandlish & Prichard,* on brief), for plaintiffs in error, H. Graham Morison, Et Al.

*Lytton H. Gibson* (*William H. Hansbarger; Gibson, Hix, Millsap & Hansbarger,* on brief), for defendants in error, G. Wallace Carper, Et Al.

I'Anson, J., delivered the opinion of the court.

G. Wallace Carper and thirty-one owners of six thousand acres of land in Fairfax county, hereinafter referred to as the appellees, filed this suit for a declaratory judgment, pursuant to § 8-578, 1950 Code, against the Board of County Supervisors, the seven individual members of the Board, the County Executive, and the Commonwealth's Attorney of the county, praying that the amendment to the Fairfax county zoning law known as the "Freehill Amendment," adopted by the county Board on August 1, 1956, be declared invalid, void and unconstitutional on the ground that the two-acre lot restriction in the western two-thirds of the county, as it affected their property, was unreasonable and arbitrary, bearing no reasonable or substantial relation to the public health, safety, morals, or general

welfare. On motion, the county executive and the commonwealth's attorney were dismissed as parties defendant.

H. Graham Morison and seven other parties, representing one thousand owners of 12,000 acres of Fairfax county land, were permitted by the court to intervene on behalf of the county.

The trial court, after hearing the evidence *ore tenus* and considering many maps and documentary evidence, filed a written opinion and entered an order declaring the "Freehill Amendment," "as to the petitioners in this matter, to be unconstitutional, invalid and void, insofar as the two-acre restriction contained in said amendment is concerned, because said amendment * * * bears no reasonable or substantial relationship to the general welfare of the owners or residents of the area so zoned, and the 'grandfather clause' contained in said amendment is discriminatory and renders the entire amendment discriminatory." To this order we granted the Board of County Supervisors and H. Graham Morison, et al., hereinafter known as the appellants, separate writs of error.

The appellants contend in their assignments of error that (1) the court below erred in holding that the amendment of August 1, 1956 (known as the "Freehill Amendment") is unconstitutional, invalid and void insofar as the two-acre zoning restriction is concerned because it bears no reasonable or substantial relationship to the general welfare of the owners or residents of the area so zoned; (2) the court erred in failing to hold that the amendment was in accord with, and is authorized by, § 15-844, 1950 Code, which empowered the Board of County Supervisors to regulate the density and distribution of population, the locations of those areas which may be used as places of residence, agriculture and for other purposes, the percentage of land area which may be occupied, the minimum sizes of yards, courts or other open spaces to promote the health, safety, order, prosperity, conservation of natural resources, and general welfare; (3) the court erred in holding that the "grandfather clause" in the amendment was discriminatory and unconstitutional; and (4) the court erred in holding that the "grandfather clause" rendered the entire amendment unconstitutional.

Fairfax county contains over 400 square miles, or over 258,000 acres of land. At the time of the adoption of the amendment to the zoning ordinance it was declared to be the fastest growing county in the United States. Its population increased from 98,000 to 201,-000 between 1950 and 1957. The total number of dwellings in the

county more than doubled during this period, increasing from 24,000 to 55,000. By 1956 the number of dwellings constructed each year had reached 6,000.

The eastern one-third of the county contains most of the concentrated development. Ninety percent of the county's entire population resides in this area.

In the western two-thirds of the county are the settled communities of Centreville, Chantilly, Dranesville, Floris and Forestville, and the incorporated towns of Clifton, Herndon and Vienna. Outside of these communities and towns, the 170,000 acres in the western two-thirds of the county consist almost entirely of wooded, agricultural and vacant land, land of three-acre tracts and over, and land subdivided into one-half acre lots used for single family residences.

The rapid population growth created the problems of obtaining an adequate sewer system, water supply, fire protection, and schools.

A substantial part of the eastern one-third is now served by a county sewer system, financed by revenue bonds, for which the full faith and credit of the county are pledged. There are also many septic tanks and private sewerage plants serving both the eastern and western areas. A large part of the eastern section obtains its water supply from public service companies serving Falls Church and Alexandria. These companies have not extended their facilities into the western two-thirds of the county to any great extent, although the evidence shows that water is now available in some sections and that it could be made available to other sections in the area.

From 1947 to 1957 the gross bonded debt of Fairfax county rose from $800,000 to $49,300,000, with a further anticipated rise by 1958 to $57,300,000, and, upon the issuance of already authorized school bonds, to nearly $67,000,000. The county's debt caused its bond rating to drop to a lower medium grade.

The original zoning ordinance for the county was enacted February 5, 1941. In 1954 it was codified and enacted as Chap. 6 of the Code of the County of Fairfax, Virginia, 1954.

The 1954 zoning law divided the county into seven districts, including an agricultural district, rural, suburban and urban residential districts, rural and general business districts, and an industrial district. The eastern one-third of the county was zoned generally for three residential districts wherein development was permitted respectively with minimum lots of one-half acre, 12,500 square feet, and 8,400 square feet. The western two-thirds of the county was

zoned generally for an agricultural district wherein development was permitted with minimum lots of one-half acre.

Under the "Freehill Amendment" the county was divided into eleven districts. The eastern one-third of the county was zoned generally for seven residential districts wherein development was permitted respectively within minimum lots of one acre, one-half acre, 15,000 square feet, 10,500 square feet, and 8,400 square feet. The western two-thirds was zoned generally for one agricultural district wherein development was permitted with minimum lots of two acres. Around two incorporated towns and four settled communities the minimum lot size was one acre.

It was the recommendation of the county planning board that the western two-thirds of the county be zoned for a minimum lot size of one acre where no central water and sewer facilities were available, and one-half acre where central water and sewer facilities were available.

The "Freehill Amendment" contained the usual provision that it should not be construed to affect vested rights, and also the following provisions:

"No provision of this amendment to this chapter representing the size and shape of lots shall affect the size or shape of lots of record prior to the adoption hereof and no provision of this amendment shall prohibit the construction of a single family dwelling on any lot of record prior to the adoption hereof if such a dwelling could have been constructed on that lot prior to the adoption of this amendment.

"For the purpose of this subsection, a lot of record prior to the adoption hereof, shall be deemed to include:

"(a) Lots in deeds, plats or subdivisions of record prior to the effective date hereof.

"(b) Lots embraced in deeds executed and acknowledged but not of record prior to the adoption hereof, provided such deeds are of record within sixty (60) days after the adoption hereof.

"(c) Lots sold under contract in conformity with existing County ordinances, executed and acknowledged prior to the adoption hereof, provided that the deeds for such lots are executed and recorded within ninety (90) days after the adoption hereof, and provided that adjacent lots under contract to the same buyer shall be considered as one lot.

"(B) Nothing in this chapter shall be construed to prevent the subdivision of land into lot sizes conforming to the ordinance 'of

March 1, 1941, as heretofore amended, or conforming to any exception to said ordinance granted by the Board of County Supervisors upon petition duly filed requesting the same, provided the preliminary plat, of such subdivision prepared and filed in accordance with the provisions of Chapter 5, Volume II of the Code of Fairfax County, Virginia (1954), shall have been submitted for approval prior to the effective date of this ordinance, and provided further that the final plat of said subdivision shall have been approved and recorded within eight months after the adoption hereof."

By subsequent action of the county Board in March and May of 1957, the time for final approval of the plat under the above quoted clause was extended to August 1, 1958.

The appellants contend that the purpose of the amendment was to solve the problems of a rapidly expanding area, and that it was authorized under the broad enabling grant contained in § 15-844, Code of 1950, which reads as follows:

"*Regulations authorized.*—For the purpose of promoting health, safety, order, prosperity, the conservation of natural resources and the general welfare, the board of supervisors of any county may regulate, by ordinance, in the unincorporated portion of the county, the density and distribution of population, the locations of those areas which may be used as places of residence or in which agriculture, forestry, trade, industry or other specific uses may be conducted, the height, bulk and size of buildings or other structures, the percentage of land area which may be occupied and the minimum sizes of yards, courts or other open spaces."

Evidence was presented on behalf of the appellants to show that the purpose and effect of the amendment were to prevent an exhaustion of ground water supplies by subdivisions of less than two-acre lots in the western two-thirds of the county; that it abolished the threat to public health by prohibiting the development of subdivisions of less than two-acre lots, using septic fields or private sewer systems; that it continued in effect existing and predicted land uses in both the eastern one-third and western two-thirds of the county; that property values in the western two-thirds had increased to some extent since its adoption; that it bolstered the precarious economic condition of the county and reduced the waste of physical and economic resources; that schools could be built in the eastern portion at much less cost than in the western area; that it would not prevent use of the land for agriculture; that it had achieved a reasonable plan

of orderly community development; that in some areas the two-acre requirement for lots was necessary to protect the character of the neighborhood; and that it had prevented extensive commercial development in the western two-thirds of the county and channeled it back into the eastern portion, where water and sewerage were available, all in the interest of the general welfare.

The evidence offered on behalf of the appellees shows that sufficient ground water supplies are available in the western area for lots of less than two acres; that public service companies could supply water if the demand justifies it; that proper sewerage facilities could be provided by the use of septic tanks or small sewage disposal systems without endangering the health of the inhabitants; that the health and safety of the county were and are protected by the sanitation ordinance, the subdivision control ordinance, and set-back requirements of the 1941 zoning ordinance, as amended; that there was a demand for houses to be built on land of less than two acres in the western area; that the effect of the "Freehill Amendment" has been to prevent use of the land for subdivision development in the western area (except as to those subdivisions for which plats were filed under the "grandfather clause" of the amendment), since subdivision of the land into two-acre minimum lots is not economically feasible, practically desirable or ordinarily used; that, as was expected, a great number of subdivision plats were filed before the effective date of the ordinance providing for lots of less than two acres; that no subdivision plats had been filed in the western area after the effective date of the ordinance, but many had been filed for development in the eastern area; that the appellees' lands are susceptible to convenient and proper subdivision into half-acre lots; that the use of the land for agriculture is no longer practical because of the high cost of labor in that area; that there was a total of 166 subdivisions in the western area containing lots of less than two acres before the filing of the many plats between the enactment and effective date of the amendment; that the land values in the eastern area had increased while there was practically no market for purchase of land in the western area after the effective date of the amendment; that the ordinance does not achieve a reasonable plan of orderly community development; that the county Board's expert witness on finances conceded the financial condition of the county could be improved and corrected by imposing higher taxes, and that it was admitted by witnesses for the county Board that the ordinance

was designed to limit commercial and residential development of the western area, thereby channeling people to the already thickly populated eastern area to promote economy in the operation of the county.

After evaluating the evidence, the trial judge was of the opinion that the real purpose of the "Freehill Amendment" was to prevent the development of the western two-thirds of the county as a residential area and to channel the county's population into the eastern one-third where the cost of operating the government would be more economical. We agree with his conclusion.

■ The general principles applicable to a judicial review of the validity of zoning ordinances are well settled. The legislative branch of a local government in the exercise of its police power has wide discretion in the enactment and amendment of zoning ordinances. Its action is presumed to be valid so long as it is not unreasonable and arbitrary. The burden of proof is on him who assails it to prove that it is clearly unreasonable, arbitrary or capricious, and that it bears no reasonable or substantial relation to the public health, safety, morals, or general welfare. The court will not substitute its judgment for that of a legislative body, and if the reasonableness of a zoning ordinance is fairly debatable it must be sustained. *Board of County Supervisors of Fairfax County* v. *Davis*, 200 Va. 316, 322 106 S. E. 2d 152, 157; *West Bros. Brick Co.* v. *City of Alexandria*, 169 Va. 271, 288, 192 S. E. 881, 888 (appeal dismissed 302 U. S. 658, 58 S. Ct. 369, 82 L. ed. 508, rehearing denied 302 U. S. 781, 58 S. Ct. 480, 82 L. ed. 603). The exercise of the police power is subject to the constitutional guarantee that no property shall be taken without due process of law and where the police power conflicts with the Constitution the latter is supreme, but courts will not restrain the exercise of such power except when the conflict is clear. *West Bros. Brick Co.* v. *City of Alexandria*, supra (169 Va. at 281, 192 S. E. at 885).

■ As stated by the learned trial judge, "the purpose of zoning is in general two-fold: to preserve the existing character of an area by excluding prejudicial uses, and to provide for the development of the several areas in a manner consistent with the uses for which they are suited. The regulations should be related to the character of the district which they affect; and should be designed to serve the welfare of those who own and occupy land in those districts." See also I Yokley, Zoning Law and Practice, § 10, pp. 12, 13.

The appellees concede that a two-acre minimum restriction is not per se invalid and that the county might have with propriety zoned a reasonable area for development of two-acre lots or more. But, they argue, to. zone the western two-thirds of the county for the purpose of preventing development that could reasonably be expected, in order to channel the population to a more congested area in the interest of economy, was unreasonable and arbitrary.

The appellants admit that there would be very little development in the western two-thirds of the county because of the two-acre requirement for lots, and that the eastern one-third would develop more rapidly in that portion not now thickly populated. The evidence discloses that although there was a flood of applications for approval of subdivisions in the western two-thirds before the effective date of the ordinance there had been none since then. The practical effect of the amendment is to prevent people in the low income bracket from living in the western area and forcing them into the eastern area, thereby reserving the western area for those who could afford to build houses on two acres or more. This would serve private rather than public interests. Such an intentional and exclusionary purpose would bear no relation to the health, safety, morals, prosperity and general welfare.

The county Board contends that the general economic effect on the county's having to furnish police and fire protection, the construction and maintenance of public schools, and other public conveniences should be considered in determining the reasonableness of the ordinance. In support of this contention counsel cites *Simon v. Town of Needham*, 311 Mass. 560, 42 N. E. 2d 516. The court said the economic effect could be considered as more or less incidental, but it also said, 42 N. E. 2d, at page 519:

"A zoning by-law cannot be adopted for the purpose of setting up a barrier against the influx of thrifty and respectable citizens who desire to live there and who are able and willing to erect homes upon lots which fair and reasonable restrictions have been imposed nor for the purpose of protecting the large estates that are already located in the district. The strictly local interests of the town must yield if it appears that they are plainly in conflict with the general interest of the public at large, and in such instances the interest of the municipality would not be allowed to stand in the way. *Euclid* v. *Ambler Realty Co.*, 272 U. S. 365, 390, 47 S. Ct. 114, 119, 71 L. ed. 303, 54 A. L. R. 1016."

■ The county Board contends that it was necessary to limit subdivision lots in the western area to a minimum of two acres to promote the health, safety, morals, prosperity and the general welfare of the people, and yet the amendment permitted a great number of land owners and developers over a period of two years after the passage of the ordinance to record plats providing for lots of a minimum size of one-half acre. If it was so imperative to promote the health, safety, morals, prosperity, and general welfare of the people by providing a minimum of two-acre lots, why did the Board open the flood gates for plats to be filed for a period of two years to defeat the very purpose it assigned for the enactment of the amendment?

The effect of the amendment has been to permit a person to build on a lot of less than two acres, while denying his neighbor the right to build unless he puts his house on a lot containing a minimum of two acres. It lacks uniformity, required under § 15-845, 1950 Code.

While the legislature has given counties the right to enact ordinances to regulate "the density and distribution of population, the locations of those areas which may be used as places of residence or in which agriculture, forestry, trade, industry or other specific uses may be conducted, * * * the percentage of the land area which may be occupied and the minimum sizes of yards, courts or other open spaces," such ordinances to be valid must be to promote public health, safety, prosperity, morals and public welfare. The mere power to enact an ordinance such as the one here involved does not carry with it the right arbitrarily or capriciously to deprive a person of the legitimate use of his property.

The evidence fully sustains the finding of the trial judge that the "Freehill Amendment", insofar as the two-acre restriction in the amendment is concerned, is unreasonable and arbitrary and that it bears no relation to the health, safety, morals or general welfare of the owners or residents of the area so zoned.

Having reached this conclusion, it is unnecessary to discuss the other assignments of error.

In each case the judgment of the trial court is

*Affirmed.*