CONSTRUCTION INDUSTRY ASSOCIATION OF SONOMA COUNTY, a California nonprofit Corporation, et al., Plaintiffs-Appellees,

v.

The CITY OF PETALUMA, a California Charter City, Defendants-Appellants.

No. 74–2100.

United States Court of Appeals, Ninth Circuit.

Aug. 13, 1975.

Rehearing and Rehearing En Banc Denied Oct. 2, 1975.

Certiorari Denied Feb. 23, 1976. See 96 S.Ct. 1148.

Robert T. Anderson (argued), Orinda, Cal., Sturgis, Den-Dlk, Douglass & Anderson, Oakland, Cal., for defendants-appellants.

Daniel Wm. Fessler, Davis, Cal. (argued), Charles M. Haar, Cambridge, Mass., on the brief, for Joint Center for Urban Studies of Mass. Institute of Technology and Harvard University, amicus curiae in support of defendants-appellants.

C. Foster Knight, San Diego, Cal. (argued), Evelle J. Younger, Atty. Gen.,

Sacramento, Cal., on the brief for State of Cal., amicus curiae in support of defendants-appellants.

Ronald J. Gilson (argued) Steinhart, Goldberg, Feigenbaum & Lader, San Francisco, Cal., for Environmental Defense Fund, Inc., amicus curiae in support of defendants-appellants.

Malcolm A. Misuraca (argued) Arata, Misuraca & Clement, Santa Rosa, Cal., for plaintiffs-appellees.

Martin E. Sloane, Washington, D. C. (argued) Arthur Wolf, Washington, D. C., on the brief, for National Committee Against Discrimination in Housing, amicus curiae in support of plaintiffs-appellees.

Donald M. Pach, Sacramento, Cal., (argued) Ronald A. Zumbrum and Thomas E. Hookano, Sacramento, Cal., on the brief, for Pacific Legal Foundation, amicus curiae in support of plaintiffs-appellees.

OPINION

Before BARNES and CHOY, Circuit Judges and EAST,* District Judge.

CHOY, Circuit Judge:

The City of Petaluma (the City) appeals from a district court decision voiding as unconstitutional certain aspects of its five-year housing and zoning plan. We reverse.

*Statement of Facts*

The City is located in southern Sonoma County, about 40 miles north of San Franciso. In the 1950's and 1960's, Petaluma was a relatively self-sufficient town. It experienced a steady population growth from 10,315 in 1950 to 24,870 in 1970. Eventually, the City was drawn into the Bay Area metropolitan housing market as people working in San Francisco and San Rafael became willing to commute longer distances to secure relatively inexpensive housing available there. By November 1972, according to unofficial figures, Petaluma's population was at 30,500, a dramatic increase of almost 25 per cent in little over two years.

The increase in the City's population, not surprisingly, is reflected in the increase in the number of its housing units. From 1964 to 1971, the following number of residential housing units were completed:

| | | | |
|---|---|---|---|
| 1964 | 270 | 1968 | 379 |
| 1965 | 440 | 1969 | 358 |
| 1966 | 321 | 1970 | 591 |
| 1967 | 234 | 1971 | 891 |

In 1970 and 1971, the years of the most rapid growth, demand for housing in the City was even greater than above indicated. Taking 1970 and 1971 together, builders won approval of a total of 2000 permits although only 1482 were actually completed by the end of 1971.

Alarmed by the accelerated rate of growth in 1970 and 1971, the demand for even more housing, and the sprawl of the City eastward, the City adopted a temporary freeze on development in early 1971. The construction and zoning change moratorium was intended to give the City Council and the City planners an opportunity to study the housing and zoning situation and to develop short and long range plans. The Council made specific findings with respect to housing patterns and availability in Petaluma, including the following: That from 1960–1970 housing had been in almost unvarying 6000 square-foot lots laid out in regular grid patterns; that there was a density of approximately 4.5 housing units per acre in the single-family home areas; that during 1960–1970, 88 per cent of housing permits issued were for single-family detached homes; that in 1970, 83 per cent of Petaluma's housing was single-family dwellings; that the bulk of recent development (largely single-family homes) occurred in the eastern portion of the City, causing a large deficiency in moderately priced multi-family and apartment units on the east side.

To correct the imbalance between single-family and multi-family dwellings, curb the sprawl of the City on the east,

---

* Honorable William G. East, Senior United States District Judge, District of Oregon, sitting by designation.

and retard the accelerating growth of the City, the Council in 1972 adopted several resolutions, which collectively are called the "Petaluma Plan" (the Plan).

The Plan, on its face limited to a five-year period (1972–1977),[1] fixes a housing development growth rate not to exceed 500 dwelling units per year.[2] Each dwelling unit represents approximately three people. The 500-unit figure is somewhat misleading, however, because it applies only to housing units (hereinafter referred to as "development-units") that are part of projects involving five units or more. Thus, the 500-unit figure does not reflect any housing and population growth due to construction of single-family homes or even four-unit apartment buildings not part of any larger project.

The Plan also positions a 200 foot wide "greenbelt" around the City,[3] to serve as a boundary for urban expansion for at least five years, and with respect to the east and north sides of the City, for perhaps ten to fifteen years. One of the most innovative features of the Plan is the Residential Development Control System which provides procedures and criteria for the award of the annual 500 development-unit permits. At the heart of the allocation procedure is an intricate point system, whereby a builder accumulates points for conformity by his projects with the City's general plan and environmental design plans, for good architectural design, and for providing low and moderate income dwelling units and various recreational facilities. The Plan further directs that allocations of building permits are to be divided as evenly as feasible between the west and east sections of the City and between single-family dwellings and multiple residential units (including rental units),[4] that the sections of the City closest to the center are to be developed first in order to cause "infilling" of vacant area, and that 8 to 12 per cent of the housing units approved be for low and moderate income persons.

In a provision of the Plan, intended to maintain the close-in rural space outside and surrounding Petaluma, the City solicited Sonoma County to establish stringent subdivision and appropriate acreage parcel controls for the areas outside the urban extension line of the City and to limit severely further residential infilling.

### Purpose of the Plan

The purpose of the Plan is much disputed in this case. According to general statements in the Plan itself, the Plan was devised to ensure that "development in the next five years, will take place in a reasonable, orderly, attractive manner, rather than in a completely haphazard and unattractive manner." The contro-

1. The district court found that although the Plan is ostensibly limited to a five-year period, official attempts have been made to perpetuate the Plan beyond 1977. Such attempts include the urban extension line (see text infra) and the agreement to purchase from the Sonoma County Water Agency only 9.8 million gallons of water per day through the year 1990. This flow is sufficient to support a population of 55,000. If the City were to grow at a rate of about 500 housing units per year (approximately three persons per unit), the City would reach a population of 55,000 about the year 1990. The 55,000 figure was mentioned by City officials as the projected optimal (and maximum) size of Petaluma. See, e. g., R.T. at 135–43, 145–46.

2. The allotment for each year is not an inflexible limitation. The Plan does provide for a 10 percent variance (50 units) below or above the 500 unit annual figure, but the expectation of the Council is that not more than 2500 units will be constructed during the five-year period.

3. At some points this urban extension line is about one-quarter of a mile beyond the present City limits.

4. By providing for the increase of multi-family dwellings (including townhouses as well as rental apartments), the Plan allows increased density. Whereas, during the years just preceding the Plan, housing density was about 4.5 units per acre, under the Plan single-family housing will consist of not only low (4.5 units per acre) but also medium density (4.5 to 10 units per acre). And multi-family housing, to comprise about half of the housing under the Plan, will be built at a density of 10 or more units per acre.

versial 500-unit limitation on residential development-units was adopted by the City "[i]n order to protect its small town character and surrounding open space." [5] The other features of the Plan were designed to encourage an east-west balance in development, to provide for variety in densities and building types and wide ranges in prices and rents, to ensure infilling of close-in vacant areas, and to prevent the sprawl of the City to the east and north. The Construction Industry Association of Sonoma County (the Association) argues and the district court found, however, that the Plan was primarily enacted "to limit Petaluma's demographic and market growth rate in housing and in the immigration of new residents." Construction Industry Assn. v. City of Petaluma, 375 F.Supp. 574, 576 (N.D.Cal.1974).

*Market Demand and Effect of the Plan*

In 1970 and 1971, housing permits were allotted at the rate of 1000 annually, and there was no indication that without some governmental control on growth consumer demand would subside or even remain at the 1000-unit per year level. Thus, if Petaluma had imposed a flat 500-unit limitation on *all* residential housing, the effect of the Plan would clearly be to retard to a substantial degree the natural growth rate of the City. Petaluma, however, did not apply the 500-unit limitation across the board, but instead exempted all projects of four units or less. Because appellees failed to introduce any evidence whatsoever as to the number of exempt units expected to be built during the five-year period, the effect of the 500 *development-unit* limitation on the natural growth in housing is uncertain. For purposes of this decision, however, we will assume that the 500 development-unit growth rate is in fact below the reasonably anticipated market demand for such units and that absent the Petaluma Plan, the City would grow at a faster rate.

According to undisputed expert testimony at trial, if the Plan (limiting housing starts to approximately 6 per cent of existing housing stock each year) were to be adopted by municipalities throughout the region, the impact on the housing market would be substantial. For the decade 1970 to 1980, the shortfall in needed housing in the region would be about 105,000 units (or 25 per cent of the units needed). Further, the aggregate effect of a proliferation of the Plan throughout the San Francisco region would be a decline in regional housing stock quality, a loss of the mobility of current and prospective residents and a deterioration in the quality and choice of housing available to income earners with real incomes of $14,000 per year or less. If, however, the Plan were considered by itself and with respect to Petaluma only, there is no evidence to suggest that there would be a deterioration in the quality and choice of housing available there to persons in the lower and middle income brackets. Actually, the Plan increases the availability of multi-family units (owner-occupied and rental units) and low-income units which were rarely constructed in the pre-Plan days.

### Court Proceedings

Two landowners (the Landowners) and the Association instituted this suit under 28 U.S.C. §§ 1331, 1343 and 42 U.S.C. § 1983 against the City and its officers and council members, claiming that the Petaluma Plan was unconstitutional. The district court ruled that certain aspects of the Plan unconstitutionally denied the right to travel insofar as they tended "to limit the natural population growth of the area." 375 F.Supp., at 588. The court enjoined the City and its agents from implementing the unconstitutional elements of the Plan, but the order was stayed by Justice Douglas pending this appeal.

5. After the appellees initiated this suit, the City attempted to show that the Plan was implemented to prevent the over-taxing of available water and sewage facilities. We find it unnecessary, however, to consider the claim that sewage and water problems justified implementation of the Plan.

## Jurisdiction

The City, on two wholly separate grounds, challenges the power of the district court to hear the suit below. The City contends that a court has no jurisdiction under 28 U.S.C. § 1343 and 42 U.S.C. § 1983 to entertain a suit against members of a city council. Relying on *City of Kenosha v. Bruno*, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973), which held that a city is not a "person" under § 1983, the City argues that its councilmen, similarly, are not "persons." This court, however, has recently faced the very issue raised by the City and has held that a city official is a "person" within the meaning of § 1983 and that a district court has jurisdiction under 28 U.S.C. § 1343 over an action to enjoin him from enforcing an unconstitutional statute. *Ybarra v. City of the Town of Los Altos Hills*, 503 F.2d 250, 253 (9th Cir. 1974).

The district court had jurisdiction not only under § 1343 but also under the general federal question statute, 28 U.S.C. § 1331. It does not appear to a legal certainty that the amount in controversy is less than $10,000. *See St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 288–89, 58 S.Ct. 586, 82 L.Ed. 845 (1938).

## Standing

The City also challenges the standing of the Association and the Landowners to maintain the suit. The standing requirement raises the threshold question in every federal case whether plaintiff has made out a "case or controversy" between himself and the defendant within the meaning of Article III of the Constitution. In order to satisfy the constitutional requirement that courts decide only cases or controversies and to ensure the requisite concreteness of facts and adverseness of parties, plaintiff must show that he has a "personal stake in the outcome of the controversy," *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962), or that he has suffered "some threatened or actual injury resulting from the putatively illegal action." *S. v. D.*, 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973). Further, the plaintiff must satisfy the additional court-imposed standing requirement that the "interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). A corollary to the "zone of interest" requirement is the well-recognized general rule that "even when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement, . . . the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975); *accord, United States v. Raines*, 362 U.S. 17, 21, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960); *Barrows v. Jackson*, 346 U.S. 249, 256, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953).

Appellees easily satisfy the "injury in fact" standing requirement. The Association alleges it has suffered in its own right monetary damages due to lost revenues. Sonoma County builders contribute dues to the Association in a sum proportionate to the amount of business the builders do in the area. Thus, in a very real sense a restriction on building in Petaluma causes economic injury to the Association.[6]

The two Landowners also have already suffered or are threatened with a direct injury. It is their position that the Petaluma Plan operated, of itself, to

---

**6.** Even assuming *arguendo* that the Association itself has not suffered a direct injury, it nonetheless has standing to represent the interests of its own members, most if not all of whom have suffered or are threatened with a direct injury. *See Warth v. Seldin*, 422 U.S. at 512, 95 S.Ct. 2197; *Sierra Club v. Morton*, 405 U.S. 727, 734–41, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

adversely affect the value and marketability of their land for residential uses, and such an allegation is sufficient to show that they have a personal stake in the outcome of the controversy. *See Golden v. Planning Board of Town of Ramapo,* 30 N.Y.2d 359, 365–66, 334 N.Y. S.2d 138, 142, 285 N.E.2d 291, 294, *appeal dismissed,* 409 U.S. 1003, 93 S.Ct. 436, 34 L.Ed.2d 294 (1972).

■ Although appellees have suffered or are threatened with direct personal injury, the "zone of interest" requirement poses a huge stumbling block to their attempt to show standing. The primary federal claim upon which this suit is based—the right to travel or migrate—is a claim asserted not on the appellees' own behalf, but on behalf of a group of unknown third parties allegedly excluded from living in Petaluma. Although individual builders, the Association, and the Landowners are admittedly adversely affected by the Petaluma Plan, their economic interests are undisputedly outside the zone of interest to be protected by any purported constitutional right to travel. Accordingly, appellees' right to travel claim "falls squarely within the prudential standing rule that normally bars litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves." *Warth v. Seldin,* 422 U.S. at 509, 95 S.Ct. at 2210.

■ There are several exceptions to this general rule, but plaintiffs do not fall within any of them. Congress may grant standing by statute to persons who might otherwise lack standing, *id.,* but here no statute expressly or by clear implication grants to persons in appellees' position a right of action based on third parties' right to travel. On several occasions, the Supreme Court has granted standing to persons whom a criminal statute directly affected to challenge the statute on the ground that if enforced it

would infringe the rights of third parties. *E. g., Doe v. Bolton,* 410 U.S. 179, 188–89, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973); *Griswold v. Connecticut,* 381 U.S. 479, 481, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). No comparison, however, may be fairly drawn between appellees and the doctors facing criminal sanctions in *Bolton* and *Griswold.* Nor do appellees allege that the Petaluma Plan preclude or otherwise adversely affects a relationship existing between them and the persons whose rights allegedly have been violated. *Cf. NAACP v. Alabama,* 357 U.S. 449, 458–60, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). The only connection between any of the appellees and any of the persons who purportedly are excluded from Petaluma is the possibility that but for the Plan they would be parties to a purchase-sale agreement.[7] There exists no special, on-going relationship between appellees and those whose rights allegedly are violated which militates in favor of granting standing. *Cf. NAACP v. Alabama, supra,* at 458–60, 78 S.Ct. 1163; *Pierce v. Society of Sisters,* 268 U.S. 510, 534–36, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Washington Utilities & Transportation Commission v. FCC,* 513 F.2d 1142, 1148 (9th Cir. 1975); *Akron Board of Education v. State Board of Education of Ohio,* 490 F.2d 1285, 1289–90 (6th Cir.), *cert. denied,* 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236 (1974). Nor have the Association and the Landowners shown that their prosecution of the suit is necessary to ensure protection of the rights asserted. *Cf. Sullivan v. Little Hunting Park,* 396 U.S. 229, 237, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969); *NAACP v. Alabama,* 357 U.S. at 459, 78 S.Ct. 1163; *Barrows v. Jackson,* 346 U.S. at 257, 73 S.Ct. 1031. Assuming *arguendo* that the constitutional right to travel applies to this case, those individuals whose mobility is impaired may bring suit on their own behalf and on behalf of those similarly situated. Although

---

7. The Association does not allege that a contractual or other relationship protected under 42 U.S.C. § 1981 and § 1982 actually exists between its members and any particular person excluded from residence in the town, or

that any such relationship was either punished or disrupted by the City. *Compare Sullivan v. Little Hunting Park,* 396 U.S. 229, 237, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969) *with Warth v. Seldin,* 422 U.S. at 514 n.22, 95 S.Ct. 2197.

*Warth v. Seldin* denied standing to a group of low-income and minority-group plaintiffs challenging exclusionary zoning practices, the case is no bar to a suit against the City brought by a proper group of plaintiffs. The Court in *Warth v. Seldin* left open the federal court doors for plaintiffs who have some interest in a particular housing project and who, but for the restrictive zoning ordinances, would be able to reside in the community.

Although we conclude that appellees lack standing to assert the rights of third parties, they nonetheless having standing to maintain claims based on violations of rights personal to them. Accordingly, appellees have standing to challenge the Petaluma Plan on the grounds asserted in their complaint that the Plan is arbitrary and thus violative of their due process rights guaranteed by the Fourteenth Amendment and that the Plan poses an unreasonable burden on interstate commerce. *See Steel Hill Development, Inc. v. Town of Sanbornton,* 469 F.2d 956, 959 (1st Cir. 1972); *Sisters of Providence of St. Mary of the Woods v. City of Evanston,* 335 F.Supp. 396, 400 (N.D.Ill.1971). The fact that one of the Landowner's property

lies wholly outside the present City boundaries and that the other's property lies mostly outside the boundaries is no bar to their challenging the City's Plan which has a direct, intended and immediate effect on the property. *See Scott v. City of Indian Wells,* 6 Cal.3d 541, 548–49, 99 Cal.Rptr. 745, 749–50, 492 P.2d 1137, 1141–42 (1972).

### Other Challenges to the Plan

Although the district court rested its decision solely on the right to travel claim,[8] all the facts and legal conclusions necessary to resolve appellees' other claims are part of the record. Thus, in order to promote judicial economy, we now dispose of the other challenges to the Plan.[9] *See Blaney v. Florida National Bank at Orlando,* 357 F.2d 27, 28 (5th Cir. 1966); *Necchi v. Necchi Sewing Machine Sales Corp.,* 348 F.2d 693, 697 (2d Cir. 1965), *cert. denied,* 383 U.S. 909, 86 S.Ct. 892, 15 L.Ed.2d 664 (1966).

### Substantive Due Process

Appellees claim that the Plan is arbitrary and unreasonable and, thus, violative of the due process clause of the Fourteenth Amendment. According to appellees, the Plan is nothing more than an exclusionary zoning device,[10] designed

---

**8.** Since the court struck down the Plan on the right to travel ground, the court believed it unnecessary to consider plaintiffs' contentions that the Plan was invalid under the commerce clause and under the equal protection clause of the Fourteenth Amendment. 375 F.Supp. at 586.

**9.** In discussing whether the Plan, although a burden on the right to travel, was justified by a compelling state interest, the court scrutinized the Plan's purpose. According to the court, the preservation of the City's small town character and the slowing down of the rate of growth by limiting the number of new homeowners were not within the public welfare. 375 F.Supp. at 586. Thus, in light of this finding, it would be a wasteful exercise to remand the case for consideration of the substantive due process issue. The court has already made clear its conclusion that the avowed purposes of the plan do not amount to legitimate governmental interests.

**10.** "Exclusionary zoning" is a phrase popularly used to describe suburban zoning regulations which have the effect, if not also the purpose, of preventing the migration of low and middle-

income persons. Since a large percentage of racial minorities fall within the low and middle income brackets, exclusionary zoning regulations may also effectively wall out racial minorities. *See generally* Aloi, Goldberg & White, *Racial and Economic Segregation by Zoning: Death Knell for Home Rule?,* 1969 U.Tol.L.Rev. 65 (1969); Bigham & Bostick, *Exclusionary Zoning Practices: An Examination of the Current Controversy,* 25 Vand.L.Rev. 1111 (1972); Davidoff & Davidoff, *Opening the Suburbs: Toward Inclusionary Land Use Controls,* 22 Syracuse L.Rev. 509 (1971); Note, *Exclusionary Zoning and Equal Protection,* 84 Harv.L.Rev. 1645 (1971).

Most court challenges to and comment upon so-called exclusionary zoning focus on such traditional zoning devices as height limitations, minimum square footage and minimum lot size requirements, and the prohibition of multifamily dwellings or mobile homes. The Petaluma Plan is unique in that although it assertedly slows the growth rate it replaces the past pattern of single-family detached homes with an assortment of housing units, varying in price and design.

solely to insulate Petaluma from the urban complex in which it finds itself. The Association and the Landowners reject, as falling outside the scope of any legitimate governmental interest, the City's avowed purposes in implementing the Plan—the preservation of Petaluma's small town character and the avoidance of the social and environmental problems caused by an uncontrolled growth rate.

In attacking the validity of the Plan, appellees rely heavily on the district court's finding that the express purpose and the actual effect of the Plan is to exclude substantial numbers of people who would otherwise elect to move to the City. 375 F.Supp. at 581. The existence of an exclusionary purpose and effect reflects, however, only *one* side of the zoning regulation. Practically all zoning restrictions have as a purpose and effect the *exclusion* of some activity or type of structure or a certain density of inhabitants. And in reviewing the reasonableness of a zoning ordinance, our inquiry does not terminate with a finding that it is for an exclusionary purpose.[11] We must determine further whether the *exclusion* bears any rational relationship to a *legitimate state interest.* If it does not, then the zoning regulation is invalid. If, on the other hand, a legitimate state interest is furthered by the zoning regulation, we must defer to the legislative act. Being neither a super legislature nor a zoning board of appeal, a federal court is without authority to weigh and reappraise the factors considered or ignored by the legislative body in passing the challenged zoning regulation.[12] The reasonableness, not the wisdom, of the Petaluma Plan is at issue in this suit.

It is well settled that zoning regulations "must find their justification in some aspect of the police power, asserted for the public welfare." *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 387, 47 S.Ct. 114, 118, 71 L.Ed. 303 (1926). The concept of the public welfare, however, is not limited to the regulation of noxious activities or dangerous structures. As the Court stated in *Berman v. Parker,* 348 U.S. 26, 33, 75 S.Ct. 98, 102, 99 L.Ed. 27 (1954):

> The concept of the public welfare is broad and inclusive. The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled.

(citations omitted). *Accord, Village of Belle Terre v. Boraas,* 416 U.S. 1, 6, 9, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974).

In determining whether the City's interest in preserving its small town character and in avoiding uncontrolled and rapid growth falls within the broad concept of "public welfare," we are considerably assisted by two recent cases. *Belle Terre, supra,* and *Ybarra v. City of Town of Los Altos Hills,* 503 F.2d 250 (9th Cir. 1974), each of which upheld as not unreasonable a zoning regulation much more restrictive than the Petaluma Plan, are dispositive of the due process issue in this case.

In *Belle Terre* the Supreme Court rejected numerous challenges [13] to a vil-

---

**11.** Our inquiry here is not unlike that involved in a case alleging denial of equal protection of the laws. The mere showing of some discrimination by the state is not sufficient to prove an invasion of one's constitutional rights. Most legislation to some extent discriminates between various classes of persons, business enterprises, or other entities. However, absent a suspect classification or invasion of fundamental rights, equal protection rights are violated only where the classification does not bear a rational relationship to a legitimate state interest. *See Ybarra v. City of Town of Los Altos Hills,* 503 F.2d 250, 254 (9th Cir. 1974).

**12.** Appellees' brief is unnecessarily oversize (125 pages) mainly because it is rife with quotations from writers on regional planning, economic regulation and sociological policies and themes. These types of considerations are more appropriate for legislative bodies than for courts.

**13.** The plaintiffs in *Belle Terre* claimed *inter alia* that the ordinance interfered with a person's right to travel and right to migrate to and settle within a state.

The Supreme Court held that since the ordinance was not aimed at transients, there was

lage's restricting land use to one-family [14] dwellings excluding lodging houses, boarding houses, fraternity houses or multiple-dwelling houses. By absolutely prohibiting the construction of or conversion of a building to other than single-family dwelling, the village ensured that it would never grow, if at all, much larger than its population of 700 living in 220 residences. Nonetheless, the Court found that the prohibition of boarding houses and other multi-family dwellings was reasonable and within the public welfare because such dwellings present urban problems, such as the occupation of a given space by more people, the increase in traffic and parked cars and the noise that comes with increased crowds. According to the Court,

> A quiet place where yards are wide, people few, and motor vehicles restricted are legitimate guidelines in a land-use project addressed to family needs. This goal is a permissible one within *Berman v. Parker, supra.* The police power is not confined to elimination of filth, stench, and unhealthy places. It is ample to lay out zones where family values, youth values, and the blessings of quiet seclusion, and clean air make the area a sanctuary for people.

416 U.S. at 9, 94 S.Ct. at 1541. While dissenting from the majority opinion in *Belle Terre* on the ground that the regulation unreasonably burdened the exercise of First Amendment associational rights, Mr. Justice Marshall concurred in the Court's express holding that a local entity's zoning power is extremely broad:

> [L]ocal zoning authorities may properly act in furtherance of the objectives

asserted to be served by the ordinance at issue here: *restricting uncontrolled growth,* solving traffic problems, keeping rental costs at a reasonable level, and making the community attractive to families. The police power which provides the justification for zoning is not narrowly confined. And, it is appropriate that we afford zoning authorities *considerable latitude in choosing the means by which to implement such purposes.*

416 U.S. at 13–14, 94 S.Ct. at 1543 (Marshall, J., dissenting) (emphasis added) (citations omitted).

Following the *Belle Terre* decision, this court in *Los Altos Hills* had an opportunity to review a zoning ordinance providing that a housing lot shall be contain not less than one acre and that no lot shall be occupied by more than one primary dwelling unit. The ordinance as a practical matter prevented poor people from living in Los Altos Hills and restricted the density, and thus the population, of the town. This court, nonetheless, found that the ordinance was rationally related to a legitimate governmental interest—*the preservation of the town's rural environment*—and, thus, did not violate the equal protection clause of the Fourteenth Amendment. 503 F.2d at 254.

Both the Belle Terre ordinance and the Los Altos Hills regulation had the purpose and effect of permanently restricting growth; nonetheless, the court in each case upheld the particular law before it on the ground that the regulation served a legitimate governmental interest falling within the concept of the public welfare: the preservation of quiet family neighborhoods (Belle Terre) and

---

no infringement of anyone's right to travel. 416 U.S. at 7, 94 S.Ct. 1536. Although due to appellees' lack of standing we do not reach today the right to travel issue, we note that the Petaluma Plan is not aimed at transients, nor does it penalize those who have recently exercised their right to travel *See CEEED v. California Coastal Zone Conservation Comm'n,* 43 Cal.App.3d 306, 118 Cal.Rptr. 315, 332–34 (1974); *cf. Dunn v. Blumstein,* 405 U.S. 330, 342, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972).

14. The word "family" as used in the ordinance meant one or more persons related by blood, adoption or marriage, living together as a single housekeeping unit. Two or fewer persons living together, though not related by blood, adoption or marriage were considered a "family." 416 U.S. at 2, 94 S.Ct. 1536.

the preservation of a rural environment (Los Altos Hills). Even less restrictive or exclusionary than the above zoning ordinances is the Petaluma Plan which, unlike those ordinances, does not freeze the population at present or near-present levels.[15] Further, unlike the Los Altos Hills ordinance and the various zoning regulations struck down by state courts in recent years, the Petaluma Plan does not have the undesirable effect of walling out any particular income class nor any racial minority group.[16]

Although we assume that some persons desirous of living in Petaluma will be excluded under the housing permit limitation and that, thus, the Plan may frustrate some legitimate regional housing needs, the Plan is not arbitrary or unreasonable. We agree with appellees that unlike the situation in the past most municipalities today are neither isolated nor wholly independent from neighboring municipalities and that, consequently, unilateral land use decisions by one local entity affect the needs and resources of an entire region. *See, e. g., Golden v. Planning Board of Town of Ramapo,* 30 N.Y.2d 359, 334

N.Y.S.2d 138, 285 N.E.2d 291, *appeal dismissed,* 409 U.S. 1003, 93 S.Ct. 436, 34 L.Ed.2d 294 (1972); *National Land & Investment Co. v. Kohn,* 419 Pa. 504, 215 A.2d 597 (1965); Note, *Phased Zoning: Regulation of the Tempo and Sequence of Land Development,* 26 Stan.L.Rev. 585, 605 (1974). It does not necessarily follow, however, that the *due process* rights of builders and landowners are violated merely because a local entity exercises in its own self-interest the police power lawfully delegated to it by the state. *See Belle Terre, supra; Los Altos Hills, supra.* If the present system of delegated zoning power does not effectively serve the state interest in furthering the general welfare of the region or entire state, it is the state legislature's and not the federal courts' role to intervene and adjust the system. As stated *supra,* the federal court is not a super zoning board and should not be called on to mark the point at which legitimate local interests in promoting the welfare of the community are outweighed by legitimate regional interests. *See* Note, *supra,* at 608–11.

We conclude therefore that under *Belle Terre* and *Los Altos Hills* the

15. Under the Petaluma Plan, the population is expected to increase at the rate of about 1500 persons annually. This rate approximates the rate of growth in the 1960's and represents about a 6 per cent increase per year over the present population.

16. Although appellees have attempted to align their business interests in attacking the Plan with legitimate housing needs of the urban poor and racial minorities, the Association has not alleged nor can it allege, based on the record in this case, that the Plan has the purpose and effect of excluding poor persons and racial minorities. *Cf. Board of County Supervisors of Fairfax County v. Carper,* 200 Va. 653, 107 S.E.2d 390 (1959). Contrary to the picture painted by appellees, the Petaluma Plan is "inclusionary" to the extent that it offers new opportunities, previously unavailable, to minorities and low and moderate-income persons. Under the pre-Plan system single family, middle-income housing dominated the Petaluma market, and as a result low and moderate income persons were unable to secure housing in the area. The Plan radically changes the previous building pattern and requires that housing permits be evenly divided between single-family and multi-family units

and that approximately eight to twelve per cent of the units be constructed specifically for low and moderate income persons.

In stark contrast, each of the exclusionary zoning regulations invalidated by state courts in recent years impeded the ability of low and moderate income persons to purchase or rent housing in the locality. *See, e. g., Southern Burlington County NAACP v. Township of Mount Laurel,* 67 N.J. 151, 336 A.2d 713 (Mar. 24, 1975) (zoned exclusively for single-family, detached dwellings and multi-family dwellings designed for middle and upper income persons); *Oakwood at Madison, Inc. v. Township of Madison,* 117 N.J.Super. 11, 283 A.2d 353 (1971) (minimum one or two acre requirement and severe limitation on multi-family units); *Appeal of Kit-Mar Builders, Inc.,* 439 Pa. 466, 268 A.2d 765 (1970) (two to three acre minimum lot size); *Appeal of Girsh,* 437 Pa. 237, 263 A.2d 395 (1970) (prohibition of apartment buildings); *National Land & Investment Co. v. Kohn,* 419 Pa. 504, 215 A.2d 597 (1965) (four acre minimum lot); *Board of County Supervisors of Fairfax County v. Carper,* 200 Va. 653, 107 S.E.2d 390 (1959) (rezoning to minimum two acre lots with the effect of keeping poor in another section of municipality).

concept of the public welfare is sufficiently broad to uphold Petaluma's desire to preserve its small town character, its open spaces and low density of population, and to grow at an orderly and deliberate pace.[17]

### Commerce Clause

The district court found that housing in Petaluma and the surrounding areas is produced substantially through goods and services in interstate commerce and that curtailment of residential growth in Petaluma will cause serious dislocation to commerce. 375 F.Supp. at 577, 579. Our ruling today, however, that the Petaluma Plan represents a reasonable and legitimate exercise of the police power obviates the necessity of remanding the case for consideration of appellees' claim that the Plan unreasonably burdens interstate commerce.

 It is well settled that a state regulation validly based on the police power does not impermissibly burden interstate commerce where the regulation neither discriminates against interstate commerce nor operates to disrupt its required uniformity. *Huron Cement Co. v. Detroit,* 362 U.S. 440, 448, 80 S.Ct. 813, 4

L.Ed.2d 852 (1960). As stated by the Supreme Court almost 25 years ago:

> When there is a reasonable basis for legislation to protect the social, as distinguished from the economic, welfare of a community, it is not for this Court because of the Commerce Clause to deny the exercise locally of the sovereign power of the [state].

*Breard v. Alexandria,* 341 U.S. 622, 640, 71 S.Ct. 920, 931, 95 L.Ed. 1233 (1951). It is wholly beyond a court's limited authority under the Commerce Clause to review state legislation by balancing reasonable social welfare legislation against its incidental burden on commerce. *Brotherhood of Locomotive Firemen & Enginemen v. Chicago, Rock Island & Pacific Railroad Co.,* 393 U.S. 129, 136, 89 S.Ct. 323, 21 L.Ed.2d 289 (1968).

 Consequently, since the local regulation here is rationally related to the social and environmental welfare of the community and does not discriminate against interstate commerce or operate to disrupt its required uniformity, appellees' claim that the Plan unreasonably burdens commerce must fail.[18]

Reversed.

---

17. Our decision upholding the Plan as not in violation of the appellees' due process rights should not be read as a permanent endorsement of the Plan. In a few years the City itself for good reason may abandon the Plan or the state may decide to alter its laws delegating its zoning power to the local authorities; or to meet legitimate regional needs, regional zoning authorities may be established. See, e. g., Cal.Gov.Code §§ 66600 et seq. (San. Francisco Bay Conservation and Development Commission); Cal.Gov.Code §§ 66801, 67000 et seq. (Tahoe Regional Planning Agency); Public Resources Code §§ 27000 et seq. (California Coastal Zone Conservation Commission). To be sure, housing needs in metropolitan areas like the San Francisco Bay Area are pressing and the needs are not being met by present methods of supplying housing. However, the federal court is not the proper forum for resolving these problems. The controversy stirred up by the present litigation, as indi-

cated by the number and variety of amici on each side, and the complex economic, political and social factors involved in this case are compelling evidence that resolution of the important housing and environmental issues raised here is exclusively the domain of the legislature.

18. Our decision today conforms with others which have upheld reasonable state environmental legislation despite some burden incidentally placed on interstate commerce. See, e. g., Huron Cement Co. v. Detroit, supra (air pollution statute); Procter & Gamble Co. v. City of Chicago, 509 F.2d 69 (7th Cir.), cert. denied, 421 U.S. 978, 95 S.Ct. 1980, 44 L.Ed.2d 470 (1975) (ban on phosphate detergents); American Can Co. v. Oregon Liquor Control Commission, 15 Or.App. 618, 517 P.2d 691 (1973) (ban on non-returnable beverage containers).